**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Francis OLINGER, Defendant-Appellant.**

No. 83–3247.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1984.

Decided April 15, 1985.

William H. Theis, Chicago, Ill., for defendant-appellant.

Barry Rand Elden, Asst. U.S. Atty., Dan K. Webb-U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, ESCHBACH, and EDWARDS,* Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge.

Defendant-appellant Francis Olinger appeals from his conviction for conspiracy to violate federal law through organized acts of vote fraud. The prosecution's factual proofs in this case are both overwhelming and all but undisputed. This appeal tells a story which would greatly resemble Edwin O'Connor's *The Last Hurrah* —except the scene is Chicago, not Boston; the date is 1982, not the first half of this century; and unlike O'Connor's humor, there is nothing funny about stealing the votes of the elderly.

A special grand jury returned a 14 count indictment against appellant and six others, charging them with various acts of vote fraud during the November 2, 1982 general election. After trial, a jury found appellant guilty on two counts: 1) conspiracy to violate the constitutional rights of qualified voters in violation of 18 U.S.C. § 241 [1]; and 2) conspiracy in violation of 18 U.S.C. § 371 [2] for the purposes of a) voting more

* The Honorable George C. Edwards, U.S. Court of Appeals for the Sixth Circuit, sitting by designation. Judge Edwards took senior status January 15, 1985.

[1] If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

18 U.S.C. § 241 (1982).

Count I of the indictment alleges a conspiracy to violate the following constitutional rights:

a. The right guaranteed to said qualified voters in the aforesaid election under Article One, Sections Two and Four to have their votes in the aforesaid election for the candidates of their choice for the office of Member of the United States House of Representatives cast and tabulated fairly and free from dilution by ballots illegally and improperly cast; and

b. The right guaranteed to said qualified voters by and under the Equal Protection and the Due Process Clauses of the Fourteenth Amendment to have their votes in the aforesaid election cast and tabulated fairly and free from dilution by ballots illegally and improperly cast and tabulated by persons charged under Illinois law with the operation and safe-keeping of the poll for said Precinct.

[2] If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a

than once in a general election, in violation of 42 U.S.C. § 1973i(e), b) giving false information to establish a voter's eligibility to vote in violation of 42 U.S.C. § 1973i(c), and c) offering to pay and paying qualified voters to vote in violation of 42 U.S.C. § 1973i(c).[3] The District Judge sentenced appellant to five years probation for each of the two counts, with sentences to be served concurrently. The Judge also ordered appellant to serve the first 90 days of his probation in jail and to enroll in an alcohol program.

Appellant raises three arguments for reversal. First, appellant contends that Count I is defective because it alleges a conspiracy to violate a right which is not recognized as a federal constitutional or statutory right, i.e. the right to vote in state and local elections free from vote fraud by persons acting under color of state law. Secondly, appellant argues that Counts I and II improperly charge conspiracies under 18 U.S.C. § 241 (hereinafter "§ 241") and 18 U.S.C. § 371 (hereinafter "§ 371"), where Congress has enacted a more specific statute, 42 U.S.C. § 1973i(c) (hereinafter "§ 1973i(c)"), to address the

crime of conspiracy to commit vote fraud. Finally, appellant argues that the District Judge erred in rejecting certain jury instructions requested by appellant.

In considering this appeal, we must view the evidence in the light most favorable to the Government. The jury could reasonably have found the following facts.

Appellant was a Republican election judge in Chicago's 27th Ward, 17th precinct.[4] Election judges are appointed by the Chicago Board of Election Commissioners, based on nominations submitted by the respective chairpersons of the Republican and Democratic parties. Appointments are confirmed by the Cook County Circuit Court. Election judges are charged with the responsibility of insuring the fairness and propriety of the electoral process.

On November 2, 1982, there was to be a general election in the City of Chicago. Offices to be filled included a member of the United States House of Representatives for the 7th Congressional District of Illinois, Governor of Illinois, and various local offices. On October 28, 1982, appellant and other 17th precinct election judges

---

misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. 18 U.S.C. § 371 (1982).

**3.** Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico. 42 U.S.C. § 1973i(c) (1982).

(1) Whoever votes more than once in an election referred to in paragraph (2) shall be

fined not more than $10,000 or imprisoned not more than five years, or both.

(2) The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands or Resident Commissioner of the Commonwealth of Puerto Rico.

(3) As used in this subsection, the term "votes more than once" does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the voting in two jurisdictions under section 1973aa–1 of this title, to the extent two ballots are not cast for an election to the same candidacy or office.
42 U.S.C. § 1973i(e) (1982).

**4.** Chicago is divided into 50 wards, and the wards are subdivided into a total of 2930 precincts. The 27th Ward, 17th precinct is located just west of downtown Chicago, in the 7th Congressional District.

attended a meeting with Raymond Hicks, Democratic Party precinct captain for the 17th precinct, at the L & B Chicken Restaurant. There they discussed a special absentee election which the election judges would conduct for the benefit of elderly and mentally handicapped residents of Monroe Pavillion, a residential facility located in the 17th precinct. Hicks told the election judges that the residents of Monroe Pavillion were "crazy." He instructed appellant and the other election judges to ignore the wishes of the residents. Instead, the election judges were told to "punch 10" on the computerized ballot for every resident. Punching 10 on the ballot resulted in a vote for each of the Democratic candidates on the ballot.

On October 30, 1982, appellant and the other election judges, with Hicks in attendance, conducted the special election at Monroe Pavillion. In over two hours of voting, approximately 52 residents voted. Appellant and the other election judges cast nearly all of those votes for the straight Democratic Party ticket by punching 10. During the voting, a Democratic Party election judge paid residents small amounts of money for their votes as appellant watched.

On the day of the general election, Hicks distributed ballot applications, along with the names of registered voters who had moved away or died, to the election judges, including the appellant. The election judges completed the ballot applications with the names of the phantom voters. Then, using the fraudulent ballot applications, the election judges cast votes according to Hicks' instructions. At some point on election day, appellant was seen leaving the 17th precinct polls with a shopping bag full of blank applications. Appellant later returned with the applications completed. Appellant watched as Hicks solicited voters and paid them $2.00 per vote. As a result of these activities, more than one-third of the 330 votes cast in the 17th precinct that election day were fraudulent.

After the ballots were tabulated, the election judges requested that Hicks pay them for their services. Hicks paid between $20.00 and $40.00 to each election judge, including appellant. Appellant received a bonus in recognition of his efforts at the special Monroe Pavillion election.

Following the election, the Chicago Board of Elections conducted an investigation of activities in the 17th precinct. Appellant and the other election judges were called to testify. Prior to giving testimony, appellant and the other judges dined once more at the L & B Chicken Restaurant. There the election judges discussed with Hicks their upcoming appearance before the Board of Elections. All of the judges, including the appellant, agreed to perjure themselves. In February of 1983, appellant appeared before the Board of Elections and denied any knowledge of vote fraud in the 17th precinct. Appellant also encouraged another election judge to alter her testimony so that it would jibe with appellant's.

### I.

A. In *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), the United States Supreme Court declined to decide whether § 241 applies to a conspiracy to cast false votes in state and local elections. The Court observed that petitioners there committed vote fraud in a primary election where voters nominated candidates for the United States Senate and House of Representatives, as well as candidates for state and local offices. In upholding the convictions, the Court stated:

We think this evidence amply supported the jury's conclusion that each of the petitioners knowingly participated in a conspiracy which contemplated the casting of false votes for all offices at issue in the election. The evidence at trial tended to show a single conspiracy, the primary objective of which was to have false votes cast for Hager but which also encompassed the casting of false votes for candidates for all other offices, including Senator Byrd and Representative Hechler. True, there was little discussion among the conspirators of

the federal votes *per se,* just as there was little discussion of the Hager votes in and of themselves, but the jury could believe this was only a reflection of the conspirators' underlying assumption that false votes would have to be cast for entire slates of candidates in order to have their fraud go undetected.

In our view, petitioners err in seeking to attach significance to the fact that the primary motive behind their conspiracy was to affect the result in the local rather than the federal election. A single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law. See *Ingram v. United States,* 360 U.S. [672] at 679–80 [79 S.Ct. 1314, 1319–20, 3 L.Ed.2d 1503]. It has long been settled that § 241 embraces a conspiracy to stuff the ballot box at an election for federal officers, and thereby to dilute the value of votes of qualified voters; see *United States v. Saylor,* 322 U.S. 385 [64 S.Ct. 1101, 88 L.Ed. 1341] (1944). See also *United States v. Mosley,* 238 U.S. 383 [35 S.Ct. 904, 59 L.Ed. 1355] (1915). This applies to primary as well as general elections. See *United States v. Classic,* 313 U.S. 299 [61 S.Ct. 1031, 85 L.Ed. 1368] (1941).

\* \* \* \* \* \*

[E]ven assuming, *arguendo,* that § 241 is limited to conspiracies to cast false votes for candidates for federal offices, we could find no plain error here. The prosecution's case, as indicated earlier, showed a single conspiracy to cast entire slates of false votes.

417 U.S. at 225–26, 227–28, 94 S.Ct. at 2262–63, 2264–65.

█ We reach the same conclusion. As in *Anderson,* the prosecution in the case before us proved a conspiracy to cast false votes for all offices on the ballot, including that of member of the United States House of Representatives. Thus, the Government presented evidence sufficient for the jury to find a violation of 18 U.S.C. § 241.

Our disposition of appellant's first argument is consistent with the case law of this Circuit. See *United States v. Bradberry,* 517 F.2d 498 (7th Cir.1975); *United States v. Bryant,* 516 F.2d 307 (7th Cir.1975); *United States v. Barker,* 514 F.2d 1077 (7th Cir.1975).

B. Appellant next contends that the District Judge erred in failing to dismiss Counts I and II on grounds that 42 U.S.C. § 1973i(c) is "the only conspiracy provision applicable to the alleged facts...." Appellant's Brief at 24. According to appellant, the § 241 and § 371 conspiracy charges were improper because § 1973i(c) is more specific and is "all-encompassing in its denunciation of conspiracies to perpetuate vote fraud." Appellant's Brief at 26. To support this argument, the appellant offers his version of the legislative history of this provision of the Voting Rights Act of 1965:

> The House Report in support of the 1965 Voting Rights Act described the proposed language that eventually became section 1973i(c) as "comprehensive" and "broad in scope." 1965 U.S.Code News, p. 2478.

Appellant's Brief at 26. Upon turning to the cited page of U.S.Code Congressional and Administrative News, we find a description of an alternative bill offered by House Republicans, a bill which Congress did not see fit to enact into law. We can only conclude that the words "comprehensive" and "broad in scope," as used by members of the House Minority in 1965, bear no more than an oblique relation to the precise meaning of § 1973i(c).

A more thorough examination of the legislative history of § 1973i(c) reveals that the provision originated as both § 11(c) of H.R. 6400 and § 14(d) of S. 1564. The differences between the bill passed by the House of Representatives and that passed by the Senate were resolved in conference. The conference report states:

> Section 11(c) of the House bill is the equivalent of section 14(d) of the Senate bill. The two versions are substantially identical. The conference report adopts section 11(c) in the House bill with an

amendment to include the election of the Resident Commissioner of the Commonwealth of Puerto Rico within the scope of the section.

Conference Report No. 711, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad.News 2437, 2578, 2580–81.

In its analysis of H.R. 6400, the House Report offers no description of § 11(c). *See* H.R.Rep. No. 439, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad.News 2437, 2462. However, the Senate Report on S. 1564 describes § 14(d) of the bill as follows:

> Subsection 14(d).—This subsection replaces subsection 11(d) of the bill as introduced which made 18 U.S.C. 1001 applicable to false statements to an examiner. As amended, this subsection provides a criminal penalty for knowingly and willfully giving false information to establish eligibility to register or vote under this act or for conspiracy with another for the purpose of encouraging illegal registration or voting or for paying or offering to pay or accepting payment either for fraudulent registration or illegal voting under the provisions of this act.

S.Rep. No. 162, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad. News 2508, 2569.

Neither this statement of the Senate Judiciary Committee nor any other pertinent legislative history support appellant's contention that § 1973i(c) represents a Congressional attempt to place all conceivable forms of vote fraud conspiracy exclusively within the ambit of this single statute.

■ In interpreting § 1973i(c), we are guided by two fundamental axioms of statutory construction:

> The first is the oft-cited rule that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *United States v. Bass,* 404 U.S. 336, 347 [92 S.Ct. 515, 522, 30 L.Ed.2d 488] (1971), quoting *Rewis v. United States,* 401 U.S. 808, 812 [91 S.Ct. 1056, 1059, 28 L.Ed.2d 493] (1971). And

the second is the principle that a more specific statute will be given precedence over a more general one, regardless of their temporal sequence. *Preiser v. Rodriguez,* 411 U.S. 475, 489–90 [93 S.Ct. 1827, 1836–37, 36 L.Ed.2d 439] (1973).

*Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980).

These rules require that we look first to the language of § 1973i(c), and then to the language of § 241 and § 371, respectively.

The pertinent portion of § 1973i(c) states:

> Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or *conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting,* or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . .

(Emphasis added).

Although the statute establishes three substantive offenses—1) giving false information, 2) paying or offering to pay for registration or voting, and 3) accepting payment for registration or voting—only a single form of conspiracy is proscribed by the statute, i.e. "conspir[ing] with another individual for the purpose of encouraging his false registration to vote or illegal voting." Thus, a conspiracy with more than one other individual, for example, would fall outside the scope of § 1973i(c). Likewise, an individual who is "encouraged" to participate in false registration or voting and agrees to become part of such a conspiracy would escape conviction for conspiracy under § 1973i(c). Different conclusions might be reached were we to give the language of the statute a liberal interpretation, but the rule of lenity counsels against expansive construction of a criminal statute.

The language of § 1973i(c) is unquestionably more specific than that of either § 241 or § 371. The pertinent portions of those statutes are set forth below:

.If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;

\* \* \* \* \* \*

They shall be fined not more than $10,-000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

18 U.S.C. § 241 (1982).

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18 U.S.C. § 371 (1982).

Both § 241 and § 371 apply to conspiracies of "two or more persons"; § 1973i(c) does not. Moreover, § 241 and § 371 proscribe a wide range of offenses against the rights of citizens and against the Government, including the acts of constitutional deprivation and deceit committed by election judges and others in the conspiracy which gave rise to the case before us. In effect, § 1973i(c) is too specific to cover the facts of the instant case; the indictment therefore properly invoked § 241 and § 371.

C. At trial, counsel for appellant requested jury instructions which would have required the Government to prove violations of both constitutional rights referred to in Paragraph 8, Count I of the indictment.[5] Appellant's requested instructions would have also required the jury to acquit unless it found that appellant agreed to all objects of the conspiracy, which are stated conjunctively in the indictment.

The United States Supreme Court has stated the law as follows:

A single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law.

*Anderson v. United States*, 417 U.S. at 226, 94 S.Ct. at 2263 (citing *Ingram v. United States*, 360 U.S. 672, 679–80, 79 S.Ct. 1314, 1319–20, 3 L.Ed.2d 1503 (1959)).

In *United States v. Kramer*, 711 F.2d 789 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), this Court stated:

A variance between allegation and proof is not fatal to a criminal conviction, assuming the proof is of an offense the grand jury intended to charge, unless it affects substantial rights of the accused, Rule 52(a) of the Federal Rules of Criminal Procedure, either by depriving him of an adequate opportunity to prepare a defense or by exposing him to a risk of being prosecuted twice for the same offense. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935);

---

**5.** "a. The right guaranteed to said qualified voters in the aforesaid election under Article One, Sections Two and Four to have their votes in the aforesaid election for the candidates of their choice for the office of Member of the United States House of Representatives cast and tabulated fairly and free from dilution by ballots illegally and improperly cast; and

b. The right guaranteed to said qualified voters by and under the Equal Protection and the Due Process Clauses of the Fourteenth Amendment to have their votes in the aforesaid election cast and tabulated fairly and free from dilution by ballots illegally and improperly cast and tabulated by persons charged under Illinois law with the operation and safe-keeping of the poll for said Precinct."

*United States v. Moser,* 509 F.2d 1089 (7th Cir.1975).

711 F.2d at 795.

In *Kramer,* the indictment alleged conspiracy to distribute marijuana *and* amphetamines. The trial judge instructed the jury that it could find the defendant guilty of the conspiracy charged in the indictment if it found that he had conspired to distribute or to possess with intent to distribute "marijuana *or* amphetamines, *or* both." 711 F.2d at 797 (emphasis added). Upon considering defendant's challenge to these instructions on appeal, this Court concluded:

> The only question then is whether the word "and" in the phrase "marijuana * * and amphetamines" in Count I of the indictment may be read to mean "or," whether, that is, a defendant charged with committing a single offense by doing A and B, each a different means of committing the offense, may be convicted if the jury finds that he did either A or B. The Supreme Court long ago held that a defendant may be convicted in that circumstance, *Crain v. United States,* 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097 (1896), and that remains the rule. *United States v. Conti,* 361 F.2d 153 (2d Cir.1966), vacated on other grounds, 390 U.S. 204 [88 S.Ct. 899, 19 L.Ed.2d 1035]. Even were that not the rule, defendant would not be able to show that he was prejudiced by the trial judge's reading of Count I. Defendant knew of that reading before his trial began (R. 39), and if the grand jury thought the evidence before it sufficient to charge defendant with a conspiracy involving two drugs, *a fortiori* it must have thought that evidence sufficient to find a conspiracy involving one of those drugs.

711 F.2d 797.

■ We find the above dispositive of appellant's third argument. The indictment gave appellant ample notice of the charges against him. Thus, he had an adequate opportunity to prepare his defense. The District Judge's instructions did not expose appellant to a risk of double prosecution for the same offense. Under these circumstances, any variance between the language of the indictment and the charge to the jury was harmless.

Appellant's suggestion that *Kramer* has been overruled or otherwise discredited by more recent decisions of this Court is not well taken. *See United States v. Muelbl,* 739 F.2d 1175, 1181–1182 and n. 4 (7th Cir.1984) (harmonizing *Kramer* and *United States v. Shively,* 715 F.2d 260 (7th Cir. 1983), *cert. denied,* — U.S. —, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984), and following *Kramer* ).

## II.

Finally, although it is arguably not essential to the decision of this case, we agree with the Government's alternative ground for affirmance. The prosecution did allege and prove a conspiracy to violate the equal protection clause of the fourteenth amendment by appellant's willful participation in fraudulent and unconstitutional dilution of the votes of citizens who voted in the November 2, 1982 election of local and state officials. By so doing, appellant violated both the fourteenth amendment to the United States Constitution and the specific prohibition of § 241.

The language of the fourteenth amendment which is directly applicable to this issue is as follows: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

Only one Circuit has to date dealt squarely with the application of this constitutional principle to vote fraud in state and local elections. Our reason for doing so in this case is to meet appellant's apparent contention that most citizens who voted in the election which is herein at issue were primarily concerned with state and local election races and hence the election should not be viewed in the legal context of a federal election. Assuming, for this section of our opinion, this was purely a local and state election, but without withdrawing our Section I treatment of this appeal, *supra,* we

1302

deny the appeal. Our reasons therefor are as follows.

■ We begin by adopting the Fourth Circuit's decision in the *Anderson* case referred to above:

During argument before this Court, the question arose for the first time whether, since the only election result challenged by the protest related to a state office, federal jurisdiction terminated when the results of the federal election were finally certified, i.e., on May 27, 1970. It is suggested that federal jurisdiction over elections under Section 241 is limited to elections in which federal offices are at stake; and, when such federal elections are finally certified, any further federal criminal jurisdiction under that statute is at an end, whatever may be the situation with reference to any state contests arising out of the election. The gravamen of this argument, then, is that since there was no contest over the votes for federal offices at the Mount Gay box after the certification of May 27, 1971 federal jurisdiction over the conspiracy ended at that time, and evidence of subsequent events at a contest hearing involving only a state office voted on at the same election, was accordingly inadmissible. As we have stated, this involved argument arose only before this Court and was not presented to the District Court. The Government has argued that, whether the conspiracy had ended or not, the evidence was admissible under the principles enunciated in *Lutwak v. United States* (1953) 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, reh. denied 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352. Moreover there necessarily arises the question whether, when the defendants have attempted to use by way of cross-examination the testimony given by certain of the Government witnesses in the election contest for purposes of contradicting the testimony of those witnesses at trial, they are in any position to object to the use by the Government of testimony by certain of the defendants themselves at that election contest. We shall, however, not tarry over these points but choose to meet directly the contention that federal jurisdiction over the alleged conspiracy ended with the certification in the federal election contests and anything happening after that certification is inadmissible in a prosecution under Section 241.

The statute under which the defendants were tried is not a narrow statute. To quote the language of the Court in *United States v. Classic* (1941) 313 U.S. 299, 322, 61 S.Ct. 1031, 1041, 85 L.Ed. 1368, it "speaks neither of elections nor of primaries. In unambiguous language it protects 'any right or privilege secured * * * by the Constitution * * *'." *See, also, Screws v. United States* (1945) 325 U.S. 91, 122 n. 17, 65 S.Ct. 1031 [1045 n. 17], 89 L.Ed. 1495 (Rutledge, J., concurring). The inclusive nature of the statute was emphasized in the recent case of *United States v. Guest* (1966) 383 U.S. 745, 753, 86 S.Ct. 1170, 1175, 16 L.Ed.2d 239, where the Court said that "[w]e have made clear in *Price* [*United ed States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267] that when § 241 speaks of 'any right or privilege secured ... by the Constitution or laws of the United States,' it means precisely that." Nor is the sweep of the statute confined to rights expressly defined in the Constitution; included among the rights "secured" thereby are those judicially determined to be fundamental and embraced by implication within the Equal Protection Clause of the Fourteenth Amendment. *United States v. Guest, supra*, at 755–756 of 383 U.S., 86 S.Ct. 1170. Right of suffrage "is a civil right of the highest order," *Oregon v. Mitchell* (1970) 400 U.S. 112, 139, 91 S.Ct. 260, 272, 27 L.Ed.2d 272 (Douglas, J. dissenting *and* concurring), and "a fundamental political right, because preservative of all rights", *Yick Wo v. Hopkins* (1886), 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220. No right is more precious than the right of suffrage. It involves "matters close to the core of our constitutional system", *Carrington v. Rash* (1965) 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 for "(f)ree and honest elections are the very foundation of our republican form of government," *MacDougall v. Green* (1948) 335 U.S. 281, 288, 69 S.Ct. 1, 4, 93 L.Ed. 3

(Douglas, J., dissenting). Truly, "(o)ther rights, even the most basic are illusory if the right to vote is undermined", *Wesberry v. Sanders* (1964) 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481. Because of these compelling considerations, the right of suffrage, whether in an election for state or federal office, is one that qualifies under the Equal Protection Clause of the Fourteenth Amendment for protection from impairment, "when such impairment resulted from dilution by a false tally, *cf., United States v. Classic,* 313 U.S. 299 [61 S.Ct. 1031] 85 L.Ed. 1368; or by a refusal to count votes from arbitrarily selected precincts, *cf., United States v. Mosley,* 238 U.S. 383 [35 S.Ct. 904] 59 L.Ed. 1355, or by a stuffing of the ballot box, *cf., Ex Parte Siebold* [10 Otto 371], 100 U.S. 371, 25 L.Ed. 717; *United States v. Saylor,* 322 U.S. 385 [64 S.Ct. 1101] 88 L.Ed. 1341." *Baker v. Carr* (1962) 369 U.S. 186, 208 and 247–48, 82 S.Ct. 691, 705 and 726, 7 L.Ed.2d 663. This was bluntly stated in *Reynolds v. Sims* (1964) 377 U.S. 533, 554–55, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506: "[T]he Constitution of the United States protects the right of all qualified citizens to vote, *in state as well as in federal elections.* * * * The right to vote can neither be denied outright, * * * nor diluted by ballotbox stuffing * * *." (Italics added)

While it may be that the Constitution provides the right to vote only in federal elections and that the right to vote in purely state elections must derive from state constitutions or laws (*see, Fortson v. Morris,* 1966, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330), it is clear that, where states provide for the election of officers, that right, as we have indicated, is protected against dilution involving "state action" under the Equal Protection Clause of the Fourteenth Amendment.

In keeping with this principle, federal courts have, since *Reynolds,* consistently acted to protect the right of suffrage in elections for state legislators and administrators. *Avery v. Midland County* (1968) 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45; *Hadley v. Junior College District* (1970) 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45;

*Dundee v. Orleans Parish Board of Supervisors of Elec.* (5th Cir.1970) 434 F.2d 135. *Cf., Katzenbach v. Morgan* (1966) 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828; *Carrington v. Rash, supra* (380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675). It has been held that any state statute limiting the right to vote in connection with the issuance of revenue bonds to support a municipal utility system to property owners is violative of the Equal Protection Clause of the Fourteenth Amendment. *Cipriano v. City of Houma* (1969) 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647. Similarly, a state limitation of suffrage in local school elections to property owners was invalidated for like reasons in *Kramer v. Union School District* (1969) 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583. Unreasonable residence requirements, imposed by the State, are likewise invalid, whether for state or federal elections. *Hadnott v. Amos* (Three-judge ct. Ala.1970) 320 F.Supp. 107, aff'd. 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318. It is, of course, true, as Justice Stewart observed in *United States v. Guest, supra* (383 U.S. at 755, 86 S.Ct. at 1176) that, "[i]t is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority." Accordingly, there must be some involvement in the election with which this action is concerned by one acting "under color" of state law. "Under color" of law has been construed as identical with and as representing state action. *United States v. Price, supra* (383 U.S. at 794, n. 7, 86 S.Ct. 1152 [n. 7]). It may be represented by action taken directly under a state statute or by a state official acting "under color" of his office. *United States v. Classic, supra,* at 326 of 313 U.S., 61 S.Ct. 1031 [1036]; *Screws v. United States* (1945) 325 U.S. 91, 107–113, 65 S.Ct. 1031 [1038–1041], 89 L.Ed. 1495. It is, however, not necessary that the "involvement of the State need be either exclusive or direct"; it may be merely "peripheral". *United States v. Guest, supra* (383 U.S. at 755), 86 S.Ct. at

1177. Nor is it essential that the state official be a party defendant; it is sufficient if the proof involves "a charge of active connivance by agents of the State" in the wrongful acts done in furtherance of the conspiracy; that will meet the test of state action, as required under the rule enunciated in *Guest. See,* Note, The Supreme Court, 1965 Term, 80 Harv.L.Rev. 91, at 109. and 155, n. 5.

*Guest* and *Reynolds* read together, it seems to us, compel the conclusion that a conspiracy by the defendants with which the official election managers connived, in order to dilute through "ballot-box stuffing" the constitutionally protected right of suffrage, as is claimed here, is within the broad language of Section 241, and this is true whether the conspiracy is directed at an election for a state or a federal office, for which the election clerks and managers were essential cogs in the conspiracy. Without their active participation, the conspiracy was ineffective, both at the election itself and in the election contest. The depositing of false ballots in the ballot box required their connivance. The listing of the names of fictitious voters on the voting list had to be done by or with the cooperation of the election clerks. And, when the election contest developed, it was necessary for the election officials and the defendants to "stick[ing] together and tell[ing] the same story", as certain of the election officials testified without objection they were instructed to do by the defendants just before the election contest hearing.

Accordingly, the argument that federal jurisdiction ended under Section 241 with the certification of the federal election results and that, necessarily, evidence of. crimes committed thereafter was inadmissible in this prosecution, is meritless, for the federal government has power not only to punish conspiracies to poison federal elections, but has power also to punish conspiracies, involving state action at least, to dilute the effect of ballots cast for the candidate of one's choice in wholly state elections.

*United States v. Anderson,* 481 F.2d 685, 698–701 (4th Cir.1973) (footnote omitted).

■ Treating this case as a state and local election, the fraudulent acts found by this jury were clearly those of election officials (including appellant) who were exercising state authority "under color" of state law. *See United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941).

The foundation Supreme Court cases for the application of the equal protection clause to the states in voting matters are *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); and *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker v. Carr,* the Supreme Court recognized that:

A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, cf. *United States v. Classic,* 313 U.S. 299 [61 S.Ct. 1031]; or by a refusal to count votes from arbitrarily selected precincts, cf. *United States v. Mosley,* 238 U.S. 383 [35 S.Ct. 904], or by a stuffing of the ballot box, cf. *Ex parte Siebold* [10 Otto 371], 100 U.S. 371; *United States v. Saylor,* 322 U.S. 385 [64 S.Ct. 1101].

369 U.S. at 208, 82 S.Ct. at 705.

The Supreme Court further stated in *Gray v. Sanders:*

Every voter's vote is entitled to be counted once. It must be correctly counted and reported. As stated in *United States v. Mosley,* 238 U.S. 383, 386 [35 S.Ct. 904, 905], "the right to have one's vote counted" has the same dignity as "the right to put a ballot in a box." It can be protected from the diluting effect of illegal ballots. *Ex parte Siebold* [10 Otto 371], 100 U.S. 371; *United States v. Saylor,* 322 U.S. 385 [64 S.Ct. 1101]. And these rights must be recognized in any preliminary election that in fact determines the true weight a vote will

have. See *United States v. Classic, supra; Smith v. Allwright,* [321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987]. The concept of political equality in the voting booth contained in the Fifteenth Amendment extends to all phases of state elections, see *Terry v. Adams,* [345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152].

372 U.S. at 380, 83 S.Ct. at 808.

Finally, in *Reynolds v. Sims,* the Court stated the law as follows:

Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, *Ex parte Yarbrough,* 110 U.S. 651 [4 S.Ct. 152, 28 L.Ed. 274], and to have their votes counted, *United States v. Mosley,* 238 U.S. 383 [35 S.Ct. 904]. In *Mosley* the Court stated that it is "as equally unquestionable that the right to have one's vote counted is as open to protection ... as the right to put a ballot in a box." 238 U.S., at 386 [35 S.Ct. at 905]. The right to vote can neither be denied outright, *Guinn v. United States,* 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340], *Lane v. Wilson,* 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281], nor destroyed by alteration of ballots, see *United States v. Classic,* 313 U.S. 299, 315 [61 S.Ct. 1031, 1037], nor diluted by ballot-box stuffing, *Ex parte Siebold* [10 Otto 371], 100 U.S. 371, *United States v. Saylor,* 322 U.S. 385 [64 S.Ct. 1101]. As the Court stated in *Classic,* "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted...." 313 U.S., at 315 [61 S.Ct. at 1037]. Racially based gerrymandering, *Gomillion v. Lightfoot,* 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110], and the conducting of white primaries, *Nixon v. Herndon,* 273 U.S. 536 [47 S.Ct. 446, 71 L.Ed. 759], *Nixon v. Condon,* 286 U.S. 73 [52 S.Ct.

484, 76 L.Ed. 984], *Smith v. Allwright,* 321 U.S. 649 [64 S.Ct. 757], *Terry v. Adams,* 345 U.S. 461 [73 S.Ct. 809, 97 L.Ed. 1152], both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible. And history has seen a continuing expansion of the scope of the right of suffrage in this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

377 U.S. at 554–55, 84 S.Ct. at 1377–78 (footnotes omitted).

The judgment is affirmed.