# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 96-4141

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | ORDER |
| Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| Darrell Chip Wadena, | * | |
| | * | |
| Appellant. | * | |

_____

No. 96-4145

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Jerry Joseph Rawley, Jr., | * | |
| | * | |
| Appellant. | * | |

_____

96-4146

_____

United States of America,        *
                                  *
          Appellee,               *
                                  *
    v.                            *
                                  *
Rick Clark,                       *
                                  *
          Appellant.              *

_____

Filed:   August 11, 1998

_____

Before McMILLIAN, LAY, and BEAM, Circuit Judges.

_____

The opinion of this court filed on June 10, 1998, is hereby withdrawn and the amended opinion is substituted in its place.  The opinion is amended in Part IV, G relating to the sentences of Rick Clark and Darrell Chip Wadena.

IT IS SO ORDERED.

A true copy.

          Attest:

               CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 96-4141

_____

| | |
|---|---|
| United States of America, | * |
| | *     <u>AMENDED OPINION</u> |
| Appellee, | * |
| | * Appeals from the United States |
| v. | * District Court for the District |
| | * of Minnesota. |
| Darrell Chip Wadena, | * |
| | * |
| Appellant. | * |

_____

No. 96-4145

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Jerry Joseph Rawley, Jr., | * |
| | * |
| Appellant. | * |

_____

96-4146

_____

United States of America,                    *
                                              *
                    Appellee,                 *
                                              *
        v.                                    *
                                              *
Rick Clark,                                   *
                                              *
                    Appellant.                *

_____

Submitted:  October 20, 1997
     Filed:   August 11, 1998

_____

Before McMILLIAN, LAY, and BEAM, Circuit Judges.

_____

LAY, Circuit Judge.


        In June 1996, Rickie Lee Clark, Jerry Joseph Rawley, Jr., and Darrell "Chip" Wadena were convicted in federal district court of conspiracy, in violation of 18 U.S.C. § 371, theft or bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666, engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2, and willful misapplication of tribal funds, in violation of 18 U.S.C. § 1163.  In addition, Clark and Rawley were

convicted of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and conspiracy to oppress free exercise of election rights, in violation of 18 U.S.C. § 241.[1]

Clark, Rawley, and Wadena appeal their convictions. On appeal, they jointly and severally challenge the federal court's jurisdiction to prosecute the charges against them. They also raise several trial and procedural errors. For the reasons discussed below, we affirm all judgments of conviction.

## I. Background

The 880,000-acre White Earth Reservation ("Reservation") is located in northwest Minnesota. The Reservation is home to the White Earth Band ("Band"), one of the six constituent bands of the Minnesota Chippewa Tribe. The Band consists of 22,000 members. Approximately 3,800 of the Band's enrolled members live on the Reservation, and the remaining members live throughout the United States. The Reservation Tribal Council ("RTC") (formerly known as the Reservation Business Committee) governs all aspects of the Band, including its economic activity.[2]

The RTC consists of five members who serve four-year terms. The Band elects the members by general elections held every two years. To be eligible for election, a candidate must be an enrolled member who resides on the Reservation. During the time frame relevant to this case, Clark, Rawley, and Wadena all served on the RTC.

---

[1]Wadena received a sentence of 51 months in prison, Clark received a sentence of 46 months in prison, and Rawley received a sentence of 37 months in prison. Each defendant was also ordered to pay restitution, fines, and a special assessment.

[2]For example, in the time period relevant to this case, the RTC controlled the distribution of assistance funds for Band members, made housing loans to various members, and conducted economic development projects.

Wadena served as Chairman, Rawley served as Treasurer, and Clark served as Councilman.

The offenses for which Clark and Rawley were convicted arose from three conspiracies: 1) the construction conspiracy; 2) the commissions conspiracy; and 3) the election conspiracy. Wadena's convictions arose solely from the construction conspiracy and the commissions conspiracy. We detail these conspiracies below.

A. The Construction Conspiracy

In 1985, Congress enacted the White Earth Reservation Land Settlement Act ("WERLSA"). 25 U.S.C. § 331. The purpose of the WERLSA was to settle numerous claims involving large portions of land on the Reservation. Id. As part of the Act, the United States appropriated $6.6 million "for economic development for the benefit of the White Earth Band of Chippewa Indians." Id. In 1991, the RTC authorized the use of approximately $5 million of this money for construction of a casino on the Reservation called the Shooting Star Casino ("Casino"). The Casino project involved approximately $24 million.

The RTC appointed Clark to oversee construction of the Casino.[3] The RTC also hired Indian-owned Gordon Construction, Inc. ("Gordon") to act as general contractor for the project. Gordon subcontracted with Northern Drywall and Construction, Inc. ("Northern") for installation of drywall and various painting services. Northern did not submit a formal bid for the subcontract. Prior to the subcontract in question, Northern had only worked on small construction projects, and in the years prior to the Casino

---

[3]Initially, the RTC appointed Jim Foster, the Band's Executive Director, to oversee the Casino construction on behalf of the RTC. Clark eventually replaced Foster.

project, Northern's gross revenues never exceeded $50,000.  Clark owned Northern, and he served as its president.

Construction of the Casino began in mid-1991 and was completed within one year.  The Casino was quite successful; it created more than 1000 jobs and generated millions of dollars in revenue.  In 1993, for example, the Band grossed $50 million, a majority of which came from the operation of the Casino.  The RTC had control over the Band's spending of all non-federal revenue such as the revenue from the Casino.

In 1993, the civil examination unit of the Internal Revenue Service ("IRS") conducted an audit of Northern.  During the audit, examiner Greg Nygren discovered Northern had made payments to Wadena totaling over $428,000.  Northern made the first payment to Wadena in July 1991, about four months before the drywall subcontract was publicized.  In response to inquiries about the payments, Clark and Wadena claimed Wadena held an undisclosed ownership interest in Northern, and the payments represented Wadena's share of profits from Northern.  However, Wadena never mentioned this alleged ownership interest on his 1990 financial statements or on loan applications he submitted in 1990.  Further, Northern's accountant did not know of Wadena's alleged interest.  Later, Clark falsified and backdated Northern's corporate minutes and stock certificates in an attempt to document Wadena's ownership interest in the company.

In 1992, Northern also made a payment to Rawley in the amount of $15,000.  Clark and Rawley claimed the payment was for consulting services.  In reality, Northern made the payment to Rawley to secure Rawley's silence about Northern's payments to Wadena, who was Rawley's long-time political rival.

The government indicted Clark, Rawley, and Wadena on August 29, 1995.  The Indictment charged defendants with eighteen counts arising from the construction of the Casino.  Count 1 alleged that all three defendants conspired to misapply tribal funds,

in violation of 18 U.S.C. §§ 371, 666, and 1163.  The object of the conspiracy was to use tribal funds for personal gain in the construction of the Casino.  Counts 2 through 18 alleged the defendants engaged in various acts of money laundering and misapplication of funds in furtherance of the conspiracy.[4]  The jury convicted Clark, Rawley, and Wadena of all counts related to the construction conspiracy.

B.  The Commissions Conspiracy

The RTC members created two commissions of which they were the sole members:  the Gaming Control Commission and the Fishing Commission ("Commissions").  The RTC members assumed no additional duties by serving on the Commissions, and the Commissions themselves were essentially functionless.[5]  Nonetheless, Clark, Rawley, and Wadena received substantial payments for their

---

[4]Count 2 charged Clark with making the $15,000 payment to Rawley, in violation of 18 U.S.C. § 666(a)(2).  Count 3 charged Rawley with accepting that payment, in violation of 18 U.S.C. § 666(a)(1)(B).  Count 4 charged Clark and Rawley with money laundering and acting as principals for money laundering, in violation of 18 U.S.C. §§ 1957 and 2.  Count 5 charged Wadena with accepting stock from Northern, in violation of 18 U.S.C. § 666(a)(1)(B).  Count 6 charged Clark with giving Wadena Northern stock, in violation of 18 U.S.C. § 666(a)(2).  Count 7 charged Wadena with accepting $428,682.50 in payments from Clark, in violation of 18 U.S.C. § 666(a)(1)(B).  Count 8 charged Clark with giving Wadena $428,682.50 in payments, in violation of 18 U.S.C. § 666(a)(2).  Count 9 charged Clark with using the mail to procure phony bids for the Casino, in violation of 18 U.S.C. § 1341.  Counts 10 through 18 charged Wadena and Clark with money laundering and acting as principals for money laundering, in violation of 18 U.S.C. §§ 1957 and 2.

[5]Wadena states "the purpose for creating a fishing commission was to formalize the new tax exemption for income generated in relation to fishing-treaty rights."  See Wadena Br. at 5.  The payments Clark, Rawley, and Wadena received from the Fishing Commission were tax exempt.

service on the Commissions.[6] At irregular intervals, and when the desire arose, Clark, Rawley, and Wadena directed the issuance of tribal funds to themselves, and they directed the Band's accounting department to code the checks as payment for commission meetings. These payments were made from the Band's general treasury, and when combined with Clark's, Rawley's and Wadena's RTC salaries for the years 1990 to 1993, the payments amounted to over $1.2 million.

In the 1995 Indictment, the government charged Clark, Rawley, and Wadena with ten counts arising from the Commissions conspiracy. Count 19 alleged the defendants conspired to misapply tribal funds, in violation of 18 U.S.C. §§ 371 and 1163. The object of this conspiracy was to obtain tribal funds in the form of excessive commission payments. Counts 20 through 28 alleged various acts of misapplication of tribal funds, theft or bribery concerning programs receiving federal funds, and money laundering.[7] The jury convicted Clark and Wadena of all counts relating to the

---

[6]These payments were in addition to the salaries Clark, Rawley, and Wadena received for service on the RTC. In 1993, Wadena's RTC salary was $144,000, Clark's RTC salary was $122,000 and Rawley's RTC salary was $102,000. The government did not allege or charge that these salaries constituted a misappropriation of tribal funds.

[7]Count 20 charged Rawley with misapplying tribal funds for the purchase of an all-terrain vehicle and a snow plow, in violation of 18 U.S.C. § 1163. Count 21 charged Clark with misapplying tribal funds for the purchase of a snowmobile, in violation of 18 U.S.C. § 1163. Count 22 charged Wadena with misapplying tribal funds for a payment on a car loan, in violation of 18 U.S.C. § 1163. Count 23 charged Rawley with misapplying $25,000 of tribal funds, in violation of 18 U.S.C. § 1163. Count 24 charged Wadena with misapplying $56,705 of tribal funds, in violation of 18 U.S.C. § 1163. Count 25 charged Clark with misapplying $54,500 of tribal funds, in violation of 18 U.S.C. § 1163. Count 26 charged Rawley with misapplying $31,000 of tribal funds, in violation of 18 U.S.C. § 1163. Count 27 charged Rawley with obtaining tribal funds by fraud and intentionally misapplying those funds, in violation of 18 U.S.C. § 666. Count 28 charged Rawley with money laundering, in violation of 18 U.S.C. § 1957.

Commissions conspiracy. The jury convicted Rawley of all counts except for one count of misapplying tribal funds.

C. The Election Conspiracy

In addition to the convictions set forth above, Rawley and Clark were also found guilty under 18 U.S.C. § 241 for conspiracy to oppress free exercise of tribal election rights. As noted above, the RTC members are elected every two years. Because most of the Band's members do not live on the Reservation, the majority of members vote by absentee ballot. The Minnesota Chippewa Tribe prescribes absentee ballot voting procedures for its constituent tribes. During the time frame relevant to this case, these procedures provided that a person who wished to vote by absentee ballot would first request a ballot from the Band's authorities. The voter would then complete the ballot and place it in an envelope upon which was printed an affidavit the voter signed and had notarized. The voter would then send the ballot directly to election headquarters where it would be tallied. During the 1994 election, numerous absentee ballots were fabricated and falsely notarized. Both Clark and Rawley had a hand in improperly notarizing absentee ballots, and Clark himself forged numerous ballots. The government emphasizes that Clark and Rawley used the United States mail as well as notaries licensed by the State of Minnesota to perpetuate the absentee ballot fraud.

In the 1995 Indictment, the government charged Clark and Rawley with sixteen counts relating to the election conspiracy. The government did not charge Wadena with any counts relating to the election conspiracy. Count 29 alleged that Clark and

Rawley conspired to injure and oppress voters, in violation of 18 U.S.C. § 241.[8]  Section 241 makes it unlawful for

> two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person in any State [or] Territory . . . in the free exercise or enjoyment of any right or privilege secured to him [or her] by the Constitution or laws of the United States, or because of his [or her] having so exercised the same. . . .

The object of this conspiracy was to procure the election of certain candidates to tribal positions by causing election officials to corruptly discharge their duties and by causing fraudulent ballots to be cast.  Counts 30 through 44 alleged various acts of misapplication of funds, mail fraud, false statements, and obstruction of justice.[9]  The jury convicted Rawley of all counts relating to the election conspiracy.  The jury convicted Clark of all counts relating to the election conspiracy except for one count of using tribal funds to pay people to assist him and others in gaining re-election.

## II.  Overall Jurisdiction

---

[8]Count 29 also named tribal election judge Carley Jasken, notary Peter Pequette, Jr., and notary Henry Harper.  The jury acquitted Jasken of all charges.  Pequette cooperated with and testified on behalf of the government.  Harper pleaded guilty to making a false writing, in violation of 18 U.S.C. § 1001.

[9]Count 30 charged Clark with using tribal funds to pay people to assist him and others in gaining re-election, in violation of 18 U.S.C. § 1163.  Count 31 charged Rawley with using tribal funds to pay people to assist him in gaining re-election, in violation of 18 U.S.C. § 1163.  Counts 32 to 41 charged Clark and Rawley with using the mails to defraud voters, and acting as principals in that mail fraud, in violation of 18 U.S.C. §§ 1341 and 2.  Counts 42 to 44 charged Harper, Pequette, and Jasken with various violations.

Each defendant challenges his convictions on various grounds. First, we address the defendants' overall challenge of the federal court's jurisdiction to prosecute them for the charged offenses. The defendants make two basic challenges: (1) the only federal law applicable to the defendants, as Native Americans, are those encompassed within the Indian Country Crimes Act, 18 U.S.C. § 1152, and the Indian Major Crimes Act, 18 U.S.C. § 1153; (2) alternatively, the defendants urge, even if general federal criminal laws do apply to them, Public Law 280 (codified at 18 U.S.C. § 1162) granted Minnesota state courts exclusive jurisdiction over crimes involving Indians and arising in Indian country.

The defendants' first jurisdictional challenge is broad-based and if true, would require this court to dismiss all charges. This particular jurisdictional claim is allegedly derived from historic interpretation of the "patchwork" of federal statutes and early case law affecting the sovereignty of Indian tribes in America. This area of the law is not easily discerned and has arisen in numerous cases both in this court and other circuit courts of appeal.[10]

The general laws of the United States were made applicable to Indian Country through the Indian Country Crimes Act, 18 U.S.C. § 1152.[11] The second paragraph of

---

[10]See, e.g., United States v. Smith, 562 F.2d 453, 455-58 (7th Cir. 1977);. United States v. Begay, 42 F.3d 486, 497-500 (9th Cir. 1994); United States v. Markiewicz, 978 F.2d 786, 797-803 (2d Cir. 1992); United States v. Blue, 722 F.2d 383, 384-86 (8th Cir. 1983).

[11]Section 1152 provides:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

the Act contains an exception to this jurisdictional grant for any crime committed by one Indian against another. As early as 1883, the Supreme Court in Ex Parte Crow Dog, 109 U.S. 556 (1883), applied this exception and dismissed a federal prosecution for murder of one Indian by another. In 1885, in order to curb a perceived lawlessness resulting from the Crow Dog decision, Congress passed the Indian Major Crimes Act, 18 U.S.C. § 1153, which provides the federal courts with exclusive jurisdiction over certain enumerated crimes.[12]

> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

This Act is sometimes referred to as the General Crimes Act. See United States v. Wheeler, 435 U.S. 313, 324 (1978).

[12]Section 1153 provides:

> (a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

> (b) Any offense referred to in subsection (a) of this

The Indian Major Crimes Act allowed for federal prosecution of certain enumerated crimes, and today, the federal government has jurisdiction over fourteen major crimes when they are committed on an Indian reservation. The Indian Major Crimes Act does not contain an Indian-against-Indian exception. Nonetheless, the defendants argue that as a result of the Indian Major Crimes Act, the federal government no longer has jurisdiction under § 1152 to prosecute crimes perpetrated by one Indian against another, unless the crime is one enumerated in § 1153.[13] In support of this argument, the defendants cite United States v. Quiver, 241 U.S. 602 (1916), wherein the Supreme Court observed that the inclusion of certain offenses within the Indian Major Crimes Act "carries with it some implication of a purpose to exclude others." 241 U.S. at 606.

In sum, the defendants argue that the only crimes which may be the basis for federal court jurisdiction are those within the Indian Country Crimes Act and the Indian Major Crimes Act. As the defendants acknowledge, this court has rejected this claim on several occasions. See, e.g., Blue, 722 F.2d at 384-86; Stone v. United States, 506

---

section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

As will be discussed infra, jurisdiction over the crimes enumerated in the Indian Major Crimes Act has now been delegated to certain states pursuant to Public Law 280.

[13]Although not relevant here, such argument must acknowledge that in states not covered by Public Law 280, the federal government could still prosecute Native Americans under the Assimilative Crimes Act, 18 U.S.C. § 13, by utilizing state law where no comparable federal law exists. Cf. United States v. Butler, 541 F.2d 730 (8th Cir. 1976). However, under the Assimilative Crimes Act, the exception involving Indian-against-Indian crimes would still apply. See, e.g., United States v. Thunder Hawk, 127 F.3d 705, 706-08 (8th Cir. 1997).

F.2d 561, 563 (8th Cir. 1974); United States v. White, 508 F.2d 453, 454-55 (8th Cir. 1974). We recognize that when addressing claims like the one made here, our court and other courts of appeal have issued opinions that seem confusing and somewhat inconsistent.[14] However, there are several reasons why we believe our earlier precedent controls.

First, many courts of appeal[15] recognize that federal courts may enforce general federal criminal laws against all persons, including Indians within Indian country.[16]

---

[14]For example, in Blue, our court stated "§ 1152 and its exceptions do not extend or restrict the application of general federal criminal statutes to Indian reservations." 722 F.2d at 384. See also Stone, 506 F.2d at 563-64; White, 508 F.2d at 454-55. This interpretation has also been made in numerous Ninth Circuit cases, most recently in Begay, 42 F.3d at 498 (Sections 1152 and 1153 "deal[] only with the application of federal enclave law to Indians and [have] no bearing on federal laws of nationwide applicability that make actions criminal wherever committed.").

In contrast, the Fourth Circuit, in United States v. Welch, 822 F.2d 460, 464 (4th Cir. 1987), reversed a conviction under the Assimilative Crimes Act, holding that "[w]hen there is a crime by an Indian against another Indian within Indian country only those offenses enumerated in the Major Crimes Act may be tried in the federal courts." In Markiewicz, the Second Circuit cited this decision with approval, stating that this "alternative approach . . . is more deferential to the Supreme Court's determination in Quiver that congress's inclusion of certain crimes in the major crimes act 'carries with it some implication of a purpose to exclude other[]' crimes." 978 F.2d at 799, (quoting Quiver, 241 U.S. at 606).

[15]See United States v. Stone, 112 F.3d 971, 973 (8th Cir. 1997); Blue, 722 F.2d at 384; Stone, 506 F.2d at 563-64; White, 508 F.2d at 454-55; see also United States v. Yannott, 42 F.3d 999, 1003-04 (6th Cir. 1994); Begay, 42 F.3d at 498; United States v. Young, 936 F.2d 1050, 1055 (9th Cir. 1991); United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1975).

[16]See Felix S. Cohen, Felix S. Cohen's Handbook of Federal Indian Law 283 (Rennard Strickland et al. eds., 1982) ("Where retained tribal sovereignty in Indian

Federal statutes of general applicability, those in which situs of the offense is not an element of the crime, are not encompassed within the Indian Country Crimes Act. As a result, the Indian-against-Indian exception contained in the Indian Country Crimes Act does not apply to federal criminal laws of general applicability.

The Second Circuit in Markiewicz, 978 F.2d 786, and the Seventh Circuit in Smith, 562 F.2d 453, emphasized that only federal laws which seek to protect a "peculiar" federal interest may be prosecuted.[17] For example, in Smith, the offense was charged under 18 U.S.C. § 111 for forcible assault on a federal officer. The Smith court found that the district court had concurrent jurisdiction with the tribal court, because of the "peculiarly Federal nature" of the assault. 562 F.2d at 458. However, this distinction actually is difficult to apply, given the presumption of jurisdictional authority of Congress to pass federal laws. If Congress passes any federal act, assuming it has constitutional authority to do so, there always exists a federal concern and interest. For this reason, identifying a federal interest in a general federal law in order to override tribal sovereignty seemingly is redundant.

At the time that the Indian Country Crimes Act was passed, it may have been assumed, as Felix Cohen points out, that federal laws outside of enclave laws were not

country is not invaded and no other particular Indian right is infringed, individual Indians and their property are normally subject to the same federal laws as other persons."); Wheeler, 435 U.S. at 330 n.30 ("Federal jurisdiction also extends to crimes committed by an Indian against a non-Indian which have not been punished in tribal court . . . and to crimes over which there is federal jurisdiction regardless of whether an Indian is involved, such as assaulting a federal officer.")

[17]Those courts reasoned that deference to tribal authority and sovereignty should allow tribal laws to deal with relations among the members of the tribe. Cf. Quiver, 241 U.S. at 603-04 (It is settled policy of Congress "to permit the personal and domestic relations of the Indians with each other to be regulated, and offenses by one Indian against the person or property of another Indian to be dealt with, according to their tribal customs and laws.").

applicable to the Indian Country. See Cohen, supra, at 296-97. However, as Indian law evolved, that premise was discarded. General federal criminal laws directed to all persons became recognized as applying equally to Native Americans within Indian Country. See Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 116-17 (1960); Cohen, supra, at 284-85.

Moreover, the Indian Country Crimes Act speaks only to the "general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States. . . ." 18 U.S.C. § 1152 (emphasis added). Because situs of the offense is not an element of any of the statutory violations committed by the defendants, none of the defendants claim the crimes for which they were convicted were enclave laws. Thus, because the offenses do not fall within the Indian Country Crimes Act, they are not subject to the Act's exception relating to crimes committed in Indian Country by one Indian against another.[18]

---

[18]Defendants rely upon Quiver, 241 U.S. 602, as authority to exempt prosecution on the theory that all of the offenses charged fall within the exclusive jurisdiction of the tribe's sovereignty because they relate to internal relations of the members of the tribe. The defendants urge that Quiver applied the exception under the Indian Country Crimes Act to a general federal law of adultery. Our research is to the contrary. The adultery statute applied was derived from the Act of March 3, 1887, ch. 397, 24 Stat. 635, which was directed toward the Territory of Utah. The law was later codified under "Certain Offenses in the Territories," ch. 13, § 316, 7 Fed. Stat. 968 (1916). Section 311 of the chapter states:

> [Places within which sections of this chapter shall apply.] Except as otherwise expressly provided, the offenses defined in this chapter shall be punished as hereinafter provided, when committed within any Territory or District, or within or upon any place within the exclusive jurisdiction of the United States.

In other words, § 316 was an enclave statute, applying only to federally controlled territory. Clearly Congress would have no authority to pass a general law,

-17-

The Indian-against-Indian exception contained in the Indian Country Crimes Act manifested, as Cohen observes, "a broad respect for tribal sovereignty, particularly in matters affecting only Indians." Cohen, supra, at 290 (citing Quiver, 241 U.S. 602, and Crow Dog, 109 U.S. 556). However, the application of general federal laws to Native Americans in this case does not implicate the tribal concerns of sovereignty addressed by the Indian Country Crimes Act exception. There may be other federal-law prosecutions that would implicate important tribal interests. However, we fail to see how tribal interests are paramount to the federal interests implicated in the various criminal charges involved here. Although the defendants are Native Americans, and their conduct took place within Indian country, tribal interests do not outweigh the federal interest in prohibiting offenses such as mail fraud, money laundering, bribery, and conspiracy. Moreover, Indian tribes are not totally independent of the United States. Federal jurisdiction over the offenses committed here is imperative for the protection of all Native Americans who are U.S. citizens living on Indian reservations.

Public Law 280

The alternative jurisdictional argument raised by the defendants may be summarily rejected. Defendants assert that even if general federal laws are applicable, under Public Law 280, the federal government has surrendered to the State of Minnesota its criminal jurisdiction over all federal offenses committed on Indian lands. As the defendants acknowledge, this court has rejected this exact argument in two recent cases: Stone, 112 F.3d 971, and United States v. Pemberton, 121 F.3d 1157 (8th Cir. 1997), cert. denied, ___ U.S. ____, 118 S. Ct. 1046 (1998). As this court observed in Pemberton: "Crimes of general applicability—that is, actions that Congress has declared illegal regardless of where they occur—are not affected by the enactment of Public Law 280 and remain within the subject-matter jurisdiction of the federal courts." 121 F.3d at 1164.

---

such as one prohibiting adultery, outside a federal enclave.

## III. Jurisdictional Challenge to the Election Conspiracy

Clark and Rawley do not challenge the sufficiency of the evidence to sustain their convictions relating to the election fraud, and the evidence of their guilt is overwhelming. However, both Clark and Rawley vigorously assert that the exercise of federal criminal jurisdiction over the conspiracy to commit election fraud is not authorized by Congress and seriously impinges upon tribal sovereignty. As such, they urge the election was within the exclusive jurisdiction of the Tribal Court. They conclude that under the principles enumerated in Quiver and Crow Dog, federal courts lack jurisdiction over matters such as tribal elections that relate to the internal affairs of the tribe.

The district court held that the conspiracy law under § 241 is a law of general applicability because the situs of the offense—in this case, voter fraud—is in no way an element of the crime. In other words, the district court's rationale was that Congress has declared any conspiracy which violates federally protected rights a crime regardless of where the offense occurs. And, as we have previously discussed, laws of general applicability "apply" with equal force when committed by a Native American on a reservation. See Part II, supra.

Clark and Rawley also challenge federal jurisdiction on the ground that the tribe exists as an independent nation over which the federal government has no jurisdiction concerning a local tribal election. There is no question that Indian tribes are quasi-sovereigns and enjoy rights and privileges of self-government and local culture. However, the Supreme Court observed early on in Talton v. Mayes that while Indian Nations are "possessed of . . . attributes of local self government, when exercising their tribal functions, all such rights are subject to the supreme legislative authority of the United States." 163 U.S. 376, 384 (1896) (citing Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641 (1890)). In this regard, tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance." Wheeler, 435 U.S. at

-19-

323. The Supreme Court emphasized the dominance of congressional authority over Indian tribes in <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49 (1978), observing: "As the Court in <u>Talton</u> recognized . . . Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." 436 U.S. at 56 (also citing <u>United States v. Kagama</u>, 118 U.S. 375, 379-81, 383-84 (1886); <u>Cherokee Nation v. Hitchcock</u>, 187 U.S. 294, 305-07 (1902)). The <u>Santa Clara</u> court went on to emphasize that the passage of the Indian Civil Rights Act, 25 U.S.C. §§ 1301-03[19] ("ICRA"), serves as an example of that authority. The Court summed up this legislation by observing: "In 25 U.S.C. § 1302, Congress acted to modify the effect of <u>Talton</u> and its progeny by imposing certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment."[20] 436 U.S. at 57.

The ICRA was passed with the declared purpose "to secur[e] for the American Indian the broad constitutional rights afforded to other Americans." <u>Santa Clara</u>, 436 U.S. at 61 (quoting S. Rep. No. 841, 90th Cong. 1st Sess. 5-6 (1967)). The passage of the ICRA resulted from congressional concern in the early 1960s that individual Native Americans had no constitutional rights under their tribal governments. <u>See</u> Alvin J. Ziontz, <u>In Defense of Tribal Sovereignty: An Analysis of Judicial Error in Construction of the Indian Civil Rights Act</u>, 20 S.D. L. Rev. 1, 1-2 (1975). The congressional subcommittee first considering the legislation "heard a great deal of

---

[19]Section 1302(8) of the ICRA states in relevant part: "No Indian tribe in exercising powers of self-government shall . . . deny to any person within its jurisdiction the equal protection of <u>its</u> laws or deprive any person of liberty or property without due process of law." (emphasis added). As the Court in <u>Santa Clara</u> points out, this is not deemed to explicitly identify with the Bill of Rights or the Fourteenth Amendment of the U.S. Constitution. <u>See</u> 436 U.S. at 63 n.14.

[20]In § 1302(8), Congress offered reassurance that no tribal government would deny to any members the equal protection of <u>the Tribe's</u> laws. Furthermore, the ICRA does not include other constitutional freedoms, such as the prohibition as to the establishment of religion, the right of counsel, etc. <u>See</u> 436 U.S. at 62-63.

testimony from Indians complaining of violations of constitutional rights by the governing bodies of Indian tribes." Id. at 2. These allegations included incidents such as harassment and detention of political dissidents, corruption of tribal courts, and—notably—election fraud. See Joseph de Raismes, The Indian Civil Rights Act of 1968 and the Pursuit of Responsible Tribal Self-Government, 20 S.D. L. Rev. 59, 73 (1975). Most commentators agree that in enacting the ICRA, Congress "sought to achieve a balance between individual rights of tribal members on the one hand and preservation of tribal autonomy, Indian customs, law and culture on the other." Ziontz, supra, at 2; see also Cohen, supra, at 666-69. Initially, a bill was contemplated to impose the same limitations on tribes as were imposed on the federal government in regard to civil rights. Cohen, supra, at 666. The end result was an act with only some of those restrictions. Id. From this reading of the legislative history, it is clear that Congress was sensitive to the question of tribal sovereignty when drafting the ICRA.

Section 241 prohibits a conspiracy to deny any person the enjoyment of a right or privilege secured by the Constitution or laws of the United States. It is the government's position that the conspiracy under § 241 was specifically directed to a law of the United States, i.e., violation of § 1302 of the ICRA. Under this theory, we must first address whether § 241 specifically applies to fraud in a tribal election.

Citing an eighty-year-old case, United States v. Bathgate, 246 U.S. 220, 225 (1918), the defendants argue that federal election fraud statutes do not extend to fraud in a general state election, and therefore should not apply to a tribal election either. But since the Bathgate decision, the Supreme Court has construed § 241 to include all rights or privileges secured by the Constitution or laws of the United States. See United States v. Guest, 383 U.S. 745, 753 (1966) (Section 241 protects equal protection rights under the Fourteenth Amendment.). More specifically, the court in Anderson v. United States, 417 U.S. 211, 226 (1974) stated that "[t]he specific intent required under § 241 is not the intent to change the outcome of a federal election, but rather the intent to have false votes cast. . . ." Subsequent to Anderson, the application of § 241 to fraud in non-

federal elections has been endorsed by this circuit, as well as several others.  See United States v. Townsley, 843 F.2d 1070, 1080 (8th Cir.), vacated in part on other grounds, 856 F.2d 1189 (8th Cir. 1988); United States v. Howard, 774 F.2d 838, 841 (7th Cir. 1985); United States v. Stollings, 501 F.2d 954, 955 (4th Cir. 1974).

In Townsley, our court specifically held that even though the objective of the conspiracy was to influence a local rather than federal election, that did not defeat the specific intent necessary to establish a conspiracy against the rights of citizens under § 241.  843 F.2d at 1080.  The court stated: "Regardless of what our view might have been were we writing on a clean slate, it is now clear that '[t]he specific intent required under § 241 is not the intent to change the outcome of a federal election, but rather the intent to have false votes cast . . . .'"  Id. (quoting Anderson, 417 U.S. at 226).  In this case, Rawley and Clark were accused of conspiring to fraudulently cast ballots in a tribal election.  Under Anderson, as long as the purpose of the conspiracy was the violation of a federal law, the conspiracy is unlawful under federal law.  See 417 U.S. at 226.

The specific question we must then address is whether the ICRA, as a law of the United States,  contains a prohibition which allows enforcement of § 241 under general principles of conspiracy law.  The ICRA specifically proscribes a violation of the Tribe's equal protection laws, as well as other constitutional rights of the Tribe.  See § 1302(8).  Article XIII of the Constitution of the Minnesota Chippewa Tribe reads:

> All members of the Minnesota Chippewa Tribe shall be accorded by the governing body equal rights, equal protection, and equal opportunities to participate in the economic resources and activities of the Tribe, and no member shall be denied any of the constitutional rights or guarantees enjoyed by other citizens of the United States, including but not limited to freedom of religion and conscience, freedom of speech, the right to orderly association or assembly, the right to petition for action or the redress of grievances, and due process of law.

-22-

(emphasis added). By direct incorporation, these rights are now explicitly protected by the ICRA. We hold they are enforceable under § 241, as a general federal law.

In addressing ballot-box stuffing in federal or state elections, the Seventh Circuit observed in United States v. Olinger, 759 F.2d 1293, 1303 (7th Cir. 1985):

> [T]he right of suffrage, whether in an election for state or federal office, is one that qualifies under the Equal Protection Clause of the Fourteenth Amendment for protection from impairment, "when such impairment resulted from dilution by a false tally, cf., United States v. Classic, 313 U.S. 299 (1941); or by a refusal to count votes from arbitrarily selected precincts, cf., United States v. Mosley, 238 U.S. 383 (1915), or by a stuffing of the ballot box, cf., Ex Parte Siebold, 100 U.S. 371 (1879); United States v. Saylor, 322 U.S. 385 (1944)." Baker v. Carr, 369 U.S. 186, 208 and 247-48 (1962). This was bluntly stated in Reynolds v. Sims, 377 U.S. 533, 554-55 (1964): "[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. . . . The right to vote can neither be denied outright, . . . nor diluted by ballotbox stuffing. . . .

We believe it is clear this protection against voter fraud has been carried over into the ICRA, as it is applies to the facts of this case. This court previously recognized the one-man-one-vote principle applies to tribal elections through the ICRA. See White Eagle v. One Feather, 478 F.2d 1311, 1314 (8th Cir. 1973); Daly v. United States, 483 F.2d 700, 704-05 (8th Cir. 1973); Means v. Wilson, 522 F.2d 833, 839 (8th Cir. 1975).[21]

---

[21]These cases are pre-Santa Clara, recognizing an implicit right to civil action under the ICRA against tribal officers and tribal councils. Santa Clara rejected the rights of tribal members to bring such civil suits in federal court, and also established that tribal counsels enjoy sovereign immunity from suit. See infra. We cite these pre-Santa Clara cases simply as a recognition of the one-man-one-vote principle included in the ICRA.

The defendants urge that these cases have all been implicitly overruled by the Santa Clara decision.  In Santa Clara, a female tribe member brought an action for injunctive and declaratory relief against the Pueblo tribal government, alleging that a Pueblo ordinance which denied tribal membership to children of female members who married outside the tribe was a violation of equal protection under the ICRA.  436 U.S. at 52-53.  The Supreme Court found that suits against the tribe under the ICRA were barred by the tribe's sovereign immunity, because nothing on the face of the ICRA purported to subject the tribes to the jurisdiction of federal courts in civil actions for declaratory or injunctive relief.  Id. at 58-59.  Additionally, the Court found that the ICRA did not impliedly authorize a private right of action against the Pueblo government. Id. at 72.

There are several reasons why the Santa Clara ruling does not control this case. First, in the case at hand, the government is asserting jurisdiction under § 241, not under the ICRA.  The only reason the ICRA needs to be referenced at all in this case is to establish that a right to be free from fraud in a tribal election does indeed exist under the laws of the United States.  There is nothing in the language of Santa Clara to indicate that the rights under the ICRA are nonexistent or in any way invalid.  Instead, Santa Clara dealt with how those rights may be enforced, and concluded they could not be enforced through a private right of action, in a civil lawsuit.  Nothing in Santa Clara addresses the U.S. government's right or obligation to assume criminal jurisdiction when one of its laws of generally applicability is violated.  Additionally, tribal immunity is not at issue in the present criminal case.

Second, in Santa Clara the Court was faced with a challenge to a duly enacted ordinance of the tribal government.  In such a case, the threat to tribal sovereignty is great because a federal court would be asked to sit in judgment of legislation enacted by a legitimate tribal government.  In this case, the question is whether jurisdiction can

be asserted over the illegitimate, <u>criminal</u> action of fraud in a tribal election. Unlike <u>Santa Clara</u>, there is no challenge to the legitimate actions of the tribe or its representatives. The charge is directed toward the individual members of the RTC who conspired to deprive the members of the Band of their civil rights guaranteed by the ICRA. The Band's right to self-determination, which the court sought to protect in <u>Santa Clara</u>, is not being threatened by ensuring that voters are not defrauded. In fact, the Band's right to free and open elections is vindicated by the present criminal action.

Third, in <u>Santa Clara</u>, the Court stressed that tribal courts are available to vindicate rights created by the ICRA and are the appropriate forums to do so. 463 U.S. at 65. But again, this is stated in the context of a <u>civil</u> action. In a <u>criminal</u> context—when the entire tribal system allegedly is controlled by a few corrupt individuals— there is no effective tribal forum available to protect an individual tribal member's civil rights.

Finally, even if jurisdiction in this case was asserted under the ICRA, <u>Santa Clara</u> would not be dispositive, because the absence of a private right of action does <u>not</u> mean absence of <u>criminal</u> jurisdiction. Rawley argues that "no voter could be a victim of a § 241 conspiracy if <u>that voter</u> could not enforce his or her voting rights under federal law in a civil action in a federal court." Rawley Br. at 28. If by this the defendant means to imply that criminal jurisdiction cannot exist without a corresponding private right of action, his premise is incorrect. Courts repeatedly have held that there is no private right of action under § 241, even though the statute allows federal authorities to pursue criminal charges. <u>See, e.g.</u>, <u>Cok v. Cosentino</u>, 876 F.2d 1, 2 (1st Cir. 1989) ("Only the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241-242 . . . These statutes do not give rise to a civil action for damages."); <u>Lerch v. Boyer</u>, 929 F. Supp. 319, 322 (N.D. Ind. 1996) (Federal criminal statute governing conspiracies against civil rights did not provide for private right of action). There are numerous other criminal statutes which the courts have found do not imply a private right of action, including the Securities and Exchange Act, <u>see</u> <u>Central</u>

Bank v. First Interstate Bank, 511 U.S. 164, 190-91 (1994); the Ashurst-Sumners Act governing shipment of prisoner-made goods in interstate commerce, see McMaster v. Minnesota, 30 F.3d 976, 981-82 (8th Cir. 1994); the federal wire fraud statute, see Official Publications Inc. v. Kable News Co., 884 F.2d 664, 667 (2d Cir. 1989); and the Federal Elections Campaign Act, see Cort v. Ash, 422 U.S. 66, 79-84 (1975).

For these reasons, Clark and Rawley cannot rely on the Santa Clara decision to support their argument that federal jurisdiction under § 241 cannot be asserted. The decision regarding private rights of action brought under the ICRA against a tribal government does not address the question of criminal jurisdiction asserted in this case.

In Stone, this court recently recognized that tribal sovereignty is "necessarily limited" and "must not conflict with the . . . overriding sovereignty of the United States." 112 F.3d at 974 (quoting United States v. Sohappy, 770 F.2d 816, 819 (9th Cir. 1985)). "Federal laws of general applicability [such as § 241] 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'" Id. (quoting Burns, 529 F.2d at 117). No such treaty right—to be free to conduct fraudulent elections against their people—is asserted here by the defendants.

Contrary to the Clark and Ramsey's argument, we find there is no reason why federal criminal jurisdiction over election fraud would work to undermine the sovereignty of the tribe or its political integrity. First, no tribal custom or tradition is being threatened by the enforcement of criminal conspiracy laws. There is no tribal custom or tradition of the Band of fraudulently using the election system to maintain positions of power for a few corrupt individuals.

Second, as the Supreme Court stated in Santa Clara, tribal courts are the preferable forum to resolve most issues arising out of the rights granted by the ICRA. 436 U.S. at 65-66. This allows legitimate tribal governments to shape their own

-26-

internal policy and assert their right to self-determination, and at the same time provides individual Native Americans a forum to air their grievances. However, tribal members are <u>not</u> able to practice self-determination when, as is alleged here, a few corrupt individuals effectively control the entire tribal system. No purpose of tribal autonomy is served by allowing a corrupt, unrepresentative system to continue unabated.

Finally, it is relevant to note that tribal governments are dependent sovereigns—not independent foreign ones. As part of this dependent status, the U.S. government serves as a trustee and has a direct responsibility as a trustee to protect the civil rights granted by Congress to the Native Americans living on the reservations. We believe failure of the United States to assert <u>criminal</u> jurisdiction over activity on a reservation when the tribal government no longer operates legitimately would be an abrogation of the U.S. government's trustee relationship with tribes such as the Chippewa. We thus conclude that Clark and Rawley may be prosecuted in federal court under § 241 because such conspiracy encompassed a violation of the ICRA, a law of the United States.

## IV. <u>Defendants' Other Challenges</u>

### A. <u>Joinder and Severance</u>

Before trial, Clark and Wadena[22] moved to sever Counts 1 through 28 (the non-election counts) from Counts 29 through 44 (the election counts), alleging the two groups involved separate and unrelated acts and transactions and were improperly joined. The defendants also argued they would be prejudiced by the joinder of the offenses because during trial, such joinder would allow the introduction of evidence that is not relevant to some of the conspiracies. For example, the defendants asserted that evidence related to the election fraud conspiracy is not relevant to the conspiracies

---

[22]Rawley does not contest the joinder of the counts charged in this case.

involving the Casino or the Commissions. The government asserted joinder was proper, alleging Clark, Rawley, and Wadena joined in multiple conspiracies to misapply tribal funds for their personal use.

Following a hearing on the defendants' pre-trial motion for severance, the district court referred the matter to a federal magistrate judge for a report and recommendation. In his report and recommendation, the magistrate judge concluded that on the face of the Indictment, the government did not allege a "single, common purpose connecting the election fraud allegations to the casino and fishing commission allegations." United States v. Wadena, Crim. No. 3-95-102 (D. Minn. Jan. 24, 1996) (magistrate judge's report and recommendation on defendants' pretrial motions). The magistrate judge recommended that the district court sever Counts 1 through 28 from Counts 29 through 44. Id.

The district court[23] disagreed, concluding the Indictment alleged three conspiracies that were a part of a series of acts or transactions, and joinder was proper. United States v. Wadena, No. 3-95-102 (D. Minn. April 11, 1996) (order adopting portions of magistrate judge's report and recommendation). The court also noted that although "a joint trial may result in evidence being admitted against one defendant that would otherwise be irrelevant in the trial of a co-defendant, the Court finds that any prejudice that may result may be avoided through limiting instructions to the jury." Id. The district court denied the defendants' motion to sever, finding severance was not warranted. Id. During trial, the district court continued to deny defendants' motions to sever.

In the present appeal, Clark and Wadena dispute the district court's joinder of Counts 1 through 28 with Counts 29 through 44. Alternatively, they dispute the district

_____

[23]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

-28-

court's denial of their motion to sever the counts. We address the defendants' claims separately.

1. Joinder under Federal Rule of Criminal Procedure 8

Federal Rule of Criminal Procedure 8 establishes the requirements for joinder of offenses or defendants in the same indictment.[24] Under Rule 8(b), defendants are properly joined "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Generally, the "same series of acts or transactions" means acts or transactions that are pursuant to a common plan or a common scheme. See United States v. Jones, 880 F.2d 55, 61 (8th Cir. 1989). "[T]he defendants need not be charged in each count." Fed. R. Crim. P. 8(b). An indictment must reveal on its face a proper basis for joinder. See United States v. Bledsoe, 674 F.2d 647, 655 (8th Cir. 1982).

---

[24]Rule 8 provides:

(a) **Joinder of Offenses**. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) **Joinder of Defendants**. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed. R. Crim. P. 8.

This Court reviews <u>de novo</u> claims of misjoinder. An error involving misjoinder "'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>United States v. Lane</u>, 474 U.S. 438, 449 (1986) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

a. <u>Propriety of Joinder with Respect to Clark</u>

Clark asserts joinder under Rule 8(b) was improper because the Indictment alleges three separate conspiracies as opposed to one overall scheme. Clark contends the government links the three conspiracies solely through an "overlap in personnel" and a "common objective of making money," and such connections are an insufficient basis for joinder. <u>See</u> Clark Br. at 39-40. Clark also claims the government's assertions that Clark, Rawley, and Wadena engaged in the non-election conspiracies to misapply tribal funds, and Clark and Rawley engaged in the election conspiracy to further that objective, are "unsupported by the indictment and factually impossible." <u>Id.</u> at 40-41. This is because Clark ran unopposed in the 1994 election, and according to the Indictment, the non-election conspiracies were complete in March 1994—three months before the June 1994 election.

We disagree with Clark's contentions. In this case, the government charged Clark with all of the offenses relating to both the non-election conspiracies and the election conspiracy. The government asserted Clark joined in the non-election conspiracies to misapply tribal funds for his personal gain. The government also contended Clark joined in the election conspiracy to ensure his and others' elections and his continued access to tribal funds. On its face, the Indictment alleges more than a mere overlap in personnel and the common objective of making money. We deem it clear that the Indictment alleges Clark participated in a series of acts or transactions with the sole purpose of furthering a common scheme of using his and others' positions in tribal government to access tribal funds and misapply those funds for his personal

gain. Thus, joinder of all counts was proper under Federal Rule of Criminal Procedure 8(b).[25]

Moreover, were we to find joinder improper with respect to Clark, such error would not require reversal. See Lane, 474 U.S. at 449. Clark contends reversal is required because he has made a showing that there was a misjoinder that had a substantial and injurious effect on the jury's verdict. Specifically, Clark claims the government used a "regrettable parade of cumulative witnesses," most of whom merely testified that they did not vote in the last tribal election, to show his bad character and impermissibly influence the jury's determination of guilt with respect to the non-election charges. See Clark Br. at 42.

We disagree with Clark's contentions for several reasons. First, during trial, the government presented evidence of the charged conspiracies in three discrete phases. Second, although the government presented numerous witnesses who testified they did not vote in the last tribal election, it is difficult to see how this testimony, which was specific to the election conspiracy, influenced the jury's findings with respect to the construction conspiracy and Commissions conspiracy. Third, the district court instructed the jury that each defendant was entitled to be treated separately, and the jury must return a separate verdict for each defendant and for each crime charged. See, e.g., Jury Inst. 12, United States v. Wadena, No. 3-95-102 (D. Minn. June 24, 1996). The jury ultimately acquitted one defendant of all charges and acquitted Clark and Rawley of one charge each. Finally, the government presented potent evidence of Clark's guilt of the charges for which he was convicted. In sum, we conclude that any alleged misjoinder did not have a substantial and injurious effect or influence on the jury's verdict with respect to Clark. See Lane, 474 U.S. at 449.

---

[25]Clark's contentions that joinder is improper because the election conspiracy came later than the other two conspiracies, and because he ran unopposed in the election, obfuscates the issue and ignores the singular and common purpose of Clark's involvement in the three conspiracies.

b. <u>Propriety of Joinder with Respect to Wadena</u>

Like Clark, Wadena argues joinder in this case was improper. In particular, Wadena claims that because the government did not allege that he was in any way involved in the election conspiracy, he should not have been tried with the other defendants who were alleged to have participated in all three conspiracies.[26] For the reasons discussed below, we conclude that even if misjoinder occurred with respect to Wadena, any such error did not have a substantial and injurious effect or influence on the jury's verdict, and reversal is not required.

Wadena alleges the government turned his trial into an "election fraud circus" by calling 136 election fraud witnesses to the stand, introducing nearly 600 election fraud exhibits, and stating in its closing argument that all the defendants were guilty of "controlling the ballot box in order to control the cashbox." <u>See</u> Wadena Br. at 22-23. Wadena asserts he suffered "overwhelming" prejudice in this "politically charged" trial. <u>Id.</u> at 23.

We disagree. As noted above, the government presented evidence relating to the three conspiracies in three distinct phases. When the government referred to the election conspiracy in its opening statement, case-in-chief, and closing argument, it specifically referred to the involvement of Clark and Rawley in that conspiracy. While Wadena correctly asserts that the government presented numerous witnesses who testified in the election conspiracy phase of the trial, as we stated above with respect to Clark, the majority of those witnesses simply testified they did not actually vote in

---

[26]Like Clark, Wadena also asserts the three alleged conspiracies were unrelated to one another, and the government's attempt to link the three conspiracies through an "overlap in personnel" and a "common objective of making money" is an insufficient basis for joinder. As stated above, we reject this allegation.

-32-

the 1994 election even though ballots were cast in their names.[27]  Further, a large portion of the exhibits presented during the election conspiracy phase of the trial consisted solely of various absentee ballots.  Overall, we do not believe the evidence presented in relation to the election conspiracy caused the jury to convict Wadena of the charges arising from the other two conspiracies.

Wadena also alleges he suffered prejudice because the district court failed to instruct the jury not to consider the extensive election fraud evidence against him.  See Wadena Br. at 24, n.15.  This argument is specious.  Perhaps the district court did not specifically tell the jury not to consider any election fraud evidence against Wadena.  However, in essence the district court told the jury to do the same thing when, as noted above, it admonished the jury to treat each defendant separately and return a separate verdict for each defendant and for each crime charged.  Finally, the government presented strong evidence of Wadena's guilt in the offenses relating to the construction conspiracy and the Commissions conspiracy.  From our de novo review of the record, we conclude that any misjoinder with respect to Wadena was harmless, and reversal is not required.  See Lane, 474 U.S. at 449.

---

[27]Significantly, one election conspiracy witness who did mention Wadena indicated it was Wadena who called the sheriff when he learned from a government investigator that certain election documents under investigation may have been deliberately shredded.

## 2. Severance under Rule 14

Federal Rule of Criminal Procedure 14 allows the trial court to order severance even if joinder was proper under Rule 8(b).[28] The decision to sever is within the sound discretion of the trial judge. See Jones, 880 F.2d at 61 (citing United States v. Adkins, 842 F.2d 210, 212 (8th Cir. 1988)). "We reverse a denial of a motion to sever only when the defendant shows an abuse of discretion that resulted in severe prejudice." United States v. Crouch, 46 F.3d 871, 875 (8th Cir. 1995). "Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that [the defendant] would have had in a severed trial." United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996).

### a. Propriety of the Refusal to Sever with Respect to Clark

Clark contends the district court's refusal to sever the offenses and the defendants was a failure to follow Rule 14 and constitutes an abuse of its discretion. Clark argues this refusal to sever the election counts from the non-election counts severely prejudiced him. In support of this assertion, Clark argues the trial was

---

[28]Rule 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

Fed. R. Crim. P. 14.

complex and lengthy, and the government's evidence relating to the election conspiracy overwhelmed and confused the jury, prevented the jury from compartmentalizing the evidence, and tainted its verdict. He argues the district court's jury instructions failed to "sufficiently negate the harmful error in this case." Clark Br. at 44.

From our review of the record, and for the reasons discussed above with respect to joinder, we conclude the district court's refusal to sever did not deprive Clark of an appreciable chance of acquittal. Therefore, the district court's refusal to sever was within its discretion. See Crouch, 46 F.3d at 875; Koskela, 86 F.3d at 126.

b. Propriety of Refusal to Sever with Respect to Wadena

Wadena contends that when the district court repeatedly refused to sever his trial from that of the other defendants, it abandoned its duty under Rule 14 and abused its discretion. In support of this argument, Wadena makes essentially the same contentions he made with respect to joinder. From our review of the record, and for the reasons discussed above with respect to joinder, we conclude the district court's refusal to grant Wadena's Rule 14 motion to sever did not cause him severe prejudice. See Crouch, 46 F.3d at 875; Koskela, 86 F.3d at 126.

B. Alleged Misuse of Civil IRS Audit

Clark and Wadena contend that in late 1993, the IRS conducted a civil audit of Northern with the express and undisclosed purpose of gathering information for a criminal investigation. Specifically, they allege the government's chief investigator in this case, Agent Michael Nelson of the IRS' Criminal Investigation Division ("CID"), had knowledge that IRS auditors were preparing to conduct a civil audit at the time the government was conducting a criminal investigation into the same matters to be examined by the civil audit. As supporting evidence of this contention, Clark and Wadena assert that in early November 1993, before the IRS formally notified

defendants of the upcoming civil audit, Agent Nelson asked Greg Nygren, an IRS representative working on the civil audit, to fax him a copy of a past tax return of Wadena's. The civil audit was not referred to the CID until 1994.

Clark and Wadena complain the IRS's simultaneous investigations violated their Fourth and Fifth Amendment rights. During trial, Clark and Wadena made various motions to suppress the evidence obtained from the civil audit and any evidence derived therefrom. The district court denied the motions. On appeal, Clark and Wadena claim the district court erred in denying their motions. We review for clear error the facts supporting a district court's denial of a motion to suppress. See United States v. Cunningham, 133 F.3d 1070, 1072 (8th Cir. 1998) (citing Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996)), petition for cert. filed, ___ U.S.L.W. ___ (U.S. April 13, 1998). We review de novo the legal conclusions based upon those facts. Id.

"[T]he IRS may not develop a criminal investigation under the auspices of a civil audit." United States v. Grunewald, 987 F.2d 531, 534 (8th Cir. 1993).

> Evidence obtained in the course of a criminal investigation, where the defendant has not been apprised of the nature of the investigation, may be suppressed only if the defendant establishes that: 1) the IRS had firm indications of fraud by the defendant, 2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendant, and 3) the IRS's conduct resulted in prejudice to defendant's constitutional rights.

Id. (citing United States v. Meier, 607 F.2d 215, 217 (8th Cir. 1979) and United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977)) (emphasis added). Although Clark and Wadena allude to the three Grunewald factors, they do not directly address the factors or acknowledge their burden to establish the existence of those factors. See Wadena Br. at 10-19; Clark Br. at 44-46. Instead, they focus their arguments on Agent

Nelson's knowledge of and alleged direction of the simultaneous criminal investigation and civil audit, as well as his alleged failure to refer the case to the CID. For the reasons discussed below, we conclude the defendants have not shown the existence of the Grunewald factors, and the IRS's investigations did not violate their Fourth and Fifth Amendment rights.

An IRS auditor conducting a civil audit who detects a firm indication of fraud must suspend the audit and refer the case for evaluation by the CID. See Grunewald, 987 F.2d at 534 (citing Audit Guidelines for Examiners, CCH Internal Revenue Manual (Audit), §§ 4231, 4564.21, 9322.1). A firm indication of fraud is different than an initial indication that fraud exists, and it is more than a mere suspicion of fraud. See Groder v. United States, 816 F.2d 139, 143 (4th Cir. 1987). Whether Nygren (the civil auditor) had a firm indication of fraud and failed to suspend the civil audit is a question of fact we review for clear error. See Cunningham, 133 F.3d at 1072. Clark and Wadena do not present any evidence showing that Nygren had a firm indication of fraud and failed to suspend the civil audit of Northern. Further, Nygren specifically denied he suspected any fraud when he mailed the audit letter to Northern. Our review of Nygren's trial testimony pertaining to the simultaneous investigations likewise does not indicate Nygren had a firm indication of fraud and failed to refer the case to the CID. Thus, neither Clark nor Wadena have established the first Grunewald factor.

"[T]he mere failure of an IRS agent to inform a defendant that information developed in an audit may result in a further criminal investigation does not indicate affirmative and intentional deceit by the IRS." Grunewald, 987 F.2d at 534. Clark and Wadena do not present clear and convincing evidence that the IRS affirmatively and intentionally misled the defendants by conducting the civil audit of Northern with the express purpose of obtaining records for the criminal investigation. Indeed, defendants point to nothing more than knowledge by Nygren that Agent Nelson was conducting a criminal investigation. Neither Clark nor Wadena have established the second Grunewald factor. Given Clark's and Wadena's failure to establish the first two

Grunewald factors, we need not address the third Grunewald factor. In sum, we conclude the district court did not err when it denied Clark's and Wadena's various motions to suppress the evidence obtained from the civil audit and any evidence derived therefrom.

C. Count 19 as a Cognizable Offense

As noted above, Count 19 of the Indictment charged Clark, Rawley, and Wadena with conspiring to misapply tribal funds, in violation of 18 U.S.C. § 1163. The object of this conspiracy was to obtain tribal funds in the form of excessive payments for serving on the Commissions. The overt acts undertaken in furtherance of this conspiracy included the creation of the Commissions and the defendants' receipt of various commission payments. The jury convicted all three defendants of this charge.

Before trial, the defendants moved to dismiss Count 19. The district court denied their motions. In the present appeal, Clark and Wadena contend the district court erred in not dismissing Count 19, because the count fails to allege a cognizable offense.[29] They argue that all of the overt acts alleged to have been committed in Count 19 were official actions taken pursuant to their capacities as members of the RTC, and the RTC as an entity or governmental body cannot conspire with itself. Clark and Wadena base this contention on Runs After v. United States, 766 F.2d 347, 354 (8th Cir. 1985), which they claim controls this case.

---

[29]Rawley does not raise this issue in his brief. The government, in a footnote, also claims Clark did not raise this issue below and is therefore barred from making this argument for the first time on appeal. The government provides no legal or factual support for this contention. Moreover, Clark contends he raised the issue below because at the pretrial motion hearing, he adopted Wadena's and Rawley's motions and arguments concerning jurisdiction, and this is a jurisdictional issue. For purposes of this appeal, we will assume Clark raised this issue below.

In Runs After, several members of the Cheyenne River Sioux challenged the validity of two resolutions passed by the Cheyenne River Sioux Reservation Tribal Council (Tribal Council). 766 F.2d at 349. The two resolutions, passed by a vote of the Tribal Council, barred certain tribal members from running in future tribal elections. Id. The plaintiffs challenged the resolutions under various federal civil rights statutes. The court rejected the plaintiffs' challenges, concluding, in part, that "individual members of the Tribal Council, acting in their official capacity as tribal council members, cannot conspire when they act together with other tribal council members in taking official action on behalf of the Tribal Council." Id. at 354 (citing Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978) (stating there is no conspiracy if the conspiratorial conduct is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his or her employment)).

Runs After is a civil suit involving a dispute between tribal members. It is not a criminal case alleging violations of federal criminal law by a tribal entity or by members of a tribal entity. More importantly, Runs After involved the conduct of tribal council members regarding two official acts of the entire tribal council—the passing of two resolutions. In the present case, it appears there was an official act of the RTC to create the Commissions. It also appears there was an official act by the RTC to approve a commission payment range for each member. However, these are not the only overt acts alleged by Count 19. The count also alleges numerous overt acts in which Clark, Rawley, and Wadena, when they wanted money for purchases, debts, etc., individually directed the tribe to issue them checks labeled as commission payments. These individual payments were not collectively approved or issued by the RTC. For these reasons, we conclude Runs After is distinguishable from this case. As Clark and Wadena provide no other support for this argument, we conclude Count 19 alleged a cognizable offense, and the district court did not err when it denied their motions to dismiss the count.

D.  Interstate Nexus in Money Laundering Counts

The Indictment charged Clark and Wadena with various counts of money laundering, in violation of 18 U.S.C. § 1957.  At the close of the government's case, Clark and Wadena filed motions for judgment of acquittal on these counts pursuant to Federal Rule of Criminal Procedure Rule 29.  They argued that during its case-in-chief, the government offered no evidence to prove the element of an interstate commerce nexus, which is an essential element of any § 1957 violation.  The district court denied their motions.

In the present appeal, Clark and Wadena contend the district court erred in denying their Rule 29 motions.  In response, the government claims the defendants waived their right to challenge the denial of their motion when they failed to renew the motion at the close of evidence, and even if this court concludes the defendants did not waive their right to appeal the denial of their motion, the government nonetheless presented sufficient evidence to prove the element of an interstate commerce nexus.  We address the government's waiver argument first.

Generally, a defendant waives the right to appeal a denial of a motion for acquittal if the defendant fails to renew the motion at the close of all of the evidence.  See Edwards v. United States, 333 F.2d 588, 589 (8th Cir. 1964).  Such a waiver limits the scope of appellate review to a determination of whether there was plain error or a defect affecting the substantial rights of the defendant.  See id.  It appears neither Wadena nor Clark renewed their motion for acquittal at the close of the evidence.  Thus, it is likely they waived their right to appeal the denial of the motion.  See id.  Nonetheless, because the government's alleged failure  to prove an essential element of the money laundering offenses would be a defect affecting the substantial rights of Clark and Wadena, we will address the issue of whether the government presented sufficient evidence to prove the element of an interstate commerce nexus.

It appears this court has not determined the quantum of evidence necessary to prove the element of an interstate commerce nexus in § 1957 cases. Other circuits, however, have held evidence that the transaction in question was in interstate commerce or utilized the instrumentalities of interstate commerce is sufficient proof of the element of an interstate commerce nexus. See, e.g., United States v. Kunzman, 54 F.3d 1522, 1527 (10th Cir. 1995) (concluding evidence of checks drawn on federally-insured banks and services purchased from an out-of-state company is sufficient to support finding of interstate commerce nexus); United States v. Peay, 972 F.2d 71, 74-75 (4th Cir. 1992) (concluding evidence that funds were deposited and withdrawn from an FDIC-insured institution provided sufficient proof of an interstate commerce nexus). The government presented evidence that the checks referenced in Counts 10 through 18 were all deposited in either the First National Bank of Detroit Lakes, Minnesota or the State Bank of Winger, Minnesota. As these institutions are FDIC-insured, the government's evidence that these checks were deposited into these institutions is sufficient proof of an interstate commerce nexus. See, e.g., Kunzman, 54 F.3d at 1527. Thus, the district court did not err when it denied Clark's and Wadena's Rule 29 motions.

E. Admission of Government's Exhibit 97

During trial, the government presented exhibit 97 for admission into evidence. Exhibit 97 consisted of a Northern check numbered 3657 in the amount of $15,000, signed by Clark, and made payable to Jerry Rawley. The exhibit also consisted of the check's register stub bearing the number 3657, the name Jerry Rawley, and the amount of $15,000. Significantly, the stub also contained a partially-erased pencil notation "gift." Before trial, Rawley raised three objections to the admission of the check stub portion of the exhibit into evidence: 1) failure to authenticate; 2) hearsay; and 3) denial of his Sixth Amendment right to confront witnesses against him. The district court admitted exhibit 97 into evidence.

On appeal, Rawley contends we must reverse his convictions of Counts 1, 3, and 4, because the district court erred in admitting exhibit 97. We review for abuse of discretion the district court's decision that exhibit 97 was authenticated and did not constitute inadmissible hearsay. See United States v. Henneberry, 719 F.2d 941, 948 (8th Cir. 1983); United States v. Jackson, 67 F.3d 1359, 1364 (8th Cir. 1995). We review de novo the district court's decision that admission of exhibit 97 did not violate Rawley's Sixth Amendment rights. See United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995).

We address Rawley's authentication argument first. A party authenticates a document by presenting evidence sufficient to support a finding that the document is what the party claims it to be. See Fed. R. Evid. 901(a). The party authenticating a document need only prove a rational basis for that party's claim that the document is what it is asserted to be. See United States v. Long, 857 F.2d 436, 442 (8th Cir. 1988) (citing United States v. Natale, 526 F.2d 1160, 1173 (2d Cir. 1975)). "This may be done with circumstantial evidence." Id. The government offered sufficient evidence to authenticate exhibit 97. Thus, the district court did not abuse its discretion when it decided the government properly authenticated exhibit 97.

Rawley's next contention is that the district court abused its discretion when it concluded the partially-erased word "gift" on the check register was not hearsay. A written statement that would ordinarily be defined as hearsay is not hearsay if the statement is offered against a party, and it is a statement of a co-conspirator of that party made during the course of and in furtherance of a conspiracy. See Fed. R. Evid. 801(d)(2)(E). The "gift" notation falls within the scope of Federal Rule of Evidence 801(d)(2)(E). Therefore, we conclude the district court did not abuse its discretion when it decided the statement "gift" is not hearsay. Additionally, after a de novo review of Rawley's Sixth Amendment challenge, we conclude it is without merit.

F. Jury Instructions

The defendants allege four errors relating to the district court's instructions to the jury. First, Clark[30] and Wadena allege the district court invaded the province of the jury by instructing the jury that the government had already proven the essential elements of two charged offenses: theft or bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666 and misapplication of tribal funds, in violation of 18 U.S.C. § 1163. Second, Clark and Wadena claim the district court deprived them of due process and a fair trial when it failed to instruct the jury regarding the required intent of a § 666 violation and a § 1163 violation. Third, Rawley contends the district court erred in submitting a jury instruction relating to Minnesota notary law. Finally, Rawley contends the district court erred when it refused to provide the jury with a theory of defense instruction he requested. We address these arguments in turn.

1. Instructions Regarding Essential Elements of Offenses

In jury instruction 29, the district court cited to the jury pertinent aspects of 18 U.S.C. § 1163, including the section's definition of the term "Indian tribal organization." The court then stated "[t]he White Earth Band of the Minnesota Chippewa Tribe is an Indian tribal organization." Jury Inst. 29, United States v. Wadena, No. 3-95-102 (D. Minn. June 24, 1996). In jury instruction 33, the district court listed the elements of an 18 U.S.C. § 666 violation. One element of a § 666 offense is that the accused must be an agent of an Indian tribal government or any agency thereof. 18 U.S.C. § 666 (emphasis added). In jury instruction 33, the court told the jury it must find "that during the time period alleged in each count the defendant was an agent of the White Earth Band of Chippewa Indians." Jury Inst. 33,

---

[30]Clark adopts Wadena's arguments regarding jury instructions pursuant to Federal Rule of Appellate Procedure 28(j) and Eighth Circuit Rule of Appellate Procedure 28A(j).

United States v. Wadena, No. 3-95-102 (D. Minn. June 24, 1996). Clark and Wadena assert that whether the Band was an Indian tribal organization under § 1163, and whether the Band was an Indian tribal government under § 666, were questions for the jury, and the district court violated their Fifth and Sixth Amendment rights by instructing the jury that these essential elements of the § 1163 and § 666 offenses had already been proven.

A court may err when it instructs a jury that a fact essential to a defendant's conviction has already been established. See Sullivan v. Louisiana, 508 U.S. 275, 277 (1993). However, an error of this type is subject to harmless error review. See United States v. Raether, 82 F.3d 192, 194 (8th Cir. 1996). Clark and Wadena have vigorously asserted throughout this appeal that the federal courts lack jurisdiction over this entire case because of the Band's status as an independent sovereign and their statuses as members of the Band. Given this position, we do not see how the court's errors in jury instructions 29 and 33, if any, could have harmed either Clark or Wadena. Thus, without addressing whether the district court's jury instructions 29 and 33 were in fact erroneous, we conclude the claimed error was harmless.

2. Failure to Instruct on Intent

Clark and Wadena claim that the district court failed to instruct the jury that, with respect to violations of 18 U.S.C. § 666 and § 1163, the jury must find they acted with an intent to injure or defraud. We disagree. Neither § 666 nor § 1163 contain such a requirement. See 18 U.S.C. §§ 666 and 1163.

3. Instructions on Minnesota Notary Law

In jury instruction 53, the district court stated: "In taking an acknowledgment, verification, or witnessing a signature a notary must determine, that the person appearing before him or her is the person whose true signature is on the instrument.

-44-

You are instructed that to do otherwise is a violation of state law." Jury Inst. 53, United States v. Wadena, No. 3-95-102 (D. Minn. June 24, 1996). Rawley objected to this instruction when the district court made it. On appeal, Rawley contends this instruction was irrelevant, and "[t]he only effect the instruction could have on the jurors was either to make the apparent state law violation somehow appear to be an element of the federal offenses, or to cast the failure [to properly notarize ballots] as evidence of bad acts by the defendants." See Rawley Br. at 35-36. We review instruction 53 for harmless error. See United States v. Ryan, 41 F.3d 361, 366 (8th Cir. 1994) (citing United States v. Voss, 787 F.2d 393, 398 (8th Cir. 1986)). In this case, the issue of whether numerous absentee ballots were properly notarized by state-certified notaries was an important aspect of the prosecution of the election conspiracy and offenses arising from that conspiracy. Thus, jury instruction 53 was not irrelevant and was not in error.

4. Rawley's Proposed Theory of Defense Instruction

With respect to the tribal election notarization process, Rawley also proposed a jury instruction indicating, in part:

> Under the laws of the Minnesota Chippewa Tribe and the White Earth Band, a violation of the requirement that an absentee vote be marked and signed in the presence of a notary public did not invalidate any absentee vote prior to the June 14, 1994, election. Accordingly, in order to find that a defendant had the intent to have a false vote cast in the 1990 or 1994 election(s), you must find that the government proved such intent, beyond a reasonable doubt, by showing evidence that the defendant intended to cast false votes in the election other than with evidence of a mere violation of the requirement that an absentee vote be marked and signed in the presence of a notary public.

See Addendum to Rawley Br. Rawley contends he was entitled to this instruction because it was timely, supported by the evidence and set forth a correct statement of

-45-

the law (i.e. 18 U.S.C. § 241). See Rawley Br. at 36-37 (citing United States ex rel., Means v. Solem, 646 F.2d 322, 328 (8th Cir. 1980)). We disagree. The district court adequately and correctly instructed the jury on the elements of the § 241 offenses, and Rawley is not entitled to particularly worded instructions regarding the § 241 offenses. Cf. United States v. Bettelyoun, 16 F.3d 850, 853 (8th Cir. 1994).

G. Sentencing Enhancement for Abuse of Trust in Money Laundering Offenses

Section 3B1.3 of the sentencing guidelines allows for a two-level increase "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."[31] Legal application of the guidelines to the facts is reviewed de novo. See, e.g., United States v. Evans, 30 F.3d 1015, 1020 (8th Cir. 1994). However, the district court's application of § 3B1.3 is a factual finding, reviewed for clear error. See United States v. Johns, 15 F.3d 740, 744 (8th Cir. 1994) (stating abuse of trust adjustment is entitled to great deference and will not be disturbed unless clearly erroneous).

In sentencing Clark and Wadena, the district court refused to group the money laundering counts (Counts 10-18) with the remaining charges and convictions, finding that "the money laundering counts in this case were not an integral part of an overall scheme" to perpetuate theft or bribery. United States v. Clark, No. 3-95-102 (D. Minn. Nov. 26, 1996) (Statement of Reasons for Imposing Sentence), at 4. Despite this finding, the district court still used § 3B1.3 to apply a two-level enhancement to the money laundering charges for abuse of a position of public trust.

---

[31]The guideline commentary states that "the position of trust must have contributed in some significant way to facilitate the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult.)" U.S.S.G. § 3B1.3, comment. (n.1) (1997).

The government contends that the enhancements were correct because, while the money-laundering charges were grouped separately, the theft and fraud counts – which involved an abuse of trust – can be considered "relevant conduct" with respect to the money laundering. In addition, the government argues, Clark and Wadena's positions allowed the defendants to engage in money-laundering activity without questions from either the bank or the tribal community. In this sense, the government argues, their positions of trust "significantly facilitated" the commission or concealment of the offense.

The first problem with this reasoning is that, while the government argues Clark and Wadena's abuse of positions of trust to obtain illegal proceeds was relevant conduct, the district court specifically found the money laundering activity was <u>not</u> related to the theft and bribery schemes. Additionally, § 2C1.2 of the sentencing guidelines specifically states that when a crime involves giving or receiving a bribe or gratuity, a sentencing court should "not apply the adjustment in § 3B1.3 (Abuse of Position or Trust or Use of a Special Skill)." U.S.S.G. § 2C1.2, comment. (n.2) (1997).[32] In other words, <u>if</u> the district court had grouped the money laundering and gratuity charges together, the guidelines would have directly prohibited an abuse of trust enhancement under § 3B1.3. By using the abuse of trust involved in the "related" bribery conduct to enhance the money laundering charges, the district court would be indirectly doing what § 2C1.2 of the guidelines directly prohibits.

Second, we find there is no evidence to support the assertion that the defendants' positions as public officials "significantly facilitated" the acts of money laundering.

_____

[32]While the guidelines do not explain this rule, it appears the prohibition against using § 3B1.3 to enhance a bribery conviction is an effort by the sentencing commission to avoid "double counting." <u>See</u> United States v. Kummer, 89 F.3d 1536, 1546 (11th Cir. 1996) ("[G]enerally § 3B1.3 should not be applied in these [bribery or gratuity] cases because the Guidelines took into consideration the fact that such cases necessarily involve abuse of positions of trust.").

The indictment charges that, on nine separate occasions, Clark gave checks from Northern Drywall to Wadena, who subsequently deposited the checks into his personal accounts at the First National Bank of Detroit Lakes, and the Farmers State Bank of Winger. There is no proof presented that the banks or the bank tellers knew Wadena was chairman of the tribal council. The checks were not from or written to the tribal council, but instead were from a private company, Northern Drywall, with Clark as president. Finally, there is no indication on any of the checks that either defendant was acting in his capacity as an official of the tribal council.

In sum, the government has failed to carry its burden of proving Wadena and Clark's positions significantly facilitated the commission or concealment of the money-laundering activities. For this reason, we reverse the two-level abuse of discretion enhancement under § 3B1.3, and remand Clark and Wadena's sentences to the district court.

The judgments of conviction for each defendant are AFFIRMED. The sentences of Clark and Wadena are remanded to the district court for resentencing.[33]

---

[33]Clark received a sentence of 46 months based upon an offense level of 22. Without a two-point enhancement for abuse of trust in the money laundering offense his offense level becomes 20. Upon resentencing, the guideline range changes from 41-51 months to 33-41 months.

Wadena received a sentence of 51 months based upon an offense level of 22. Without the two-point enhancement for breach of trust, his new offense level is 20. Upon resentencing, the guideline range changes from 41-51 months to 33-41 months.

BEAM, Circuit Judge, concurring and, in part, dissenting.

I concur in the result reached by the court in Part II and, with qualification,[34] Part IV. I disagree, however, with the court's conclusion in Part III that we have jurisdiction to prosecute Clark and Rawley for a violation of 18 U.S.C. § 241. Therefore, I dissent in part.

In asserting subject-matter jurisdiction under this general federal criminal law, the court not only disregards the longstanding federal policy of advancing tribal self-determination, but blatantly fails to apply circuit precedent. We have held that "if a particular Indian right or policy is infringed by a general federal criminal law, that law will be held not to apply to Indians on reservations unless specifically so provided." United States v. Blue, 722 F.2d 383, 385 (8th Cir. 1983) (McMillian, J.). The right of tribal self-government has long been recognized and protected by both the courts, see, e.g., United States v. Kagama, 118 U.S. 375, 381-82 (1886), and Congress, see, e.g., 18 U.S.C. § 1152 (declaring that "[t]his section shall not extend to offenses committed by one Indian against the person or property of another Indian"). In my view, the exclusive right to prosecute members for fraud in a tribal election is a necessary and intimate aspect of tribal self-government. Federal prosecution of tribal election crimes will severely interfere with the tribes' ability, as separate sovereigns, to eradicate such

---

[34]The court boldly cites United Stated v. Bledsoe, 674 F.2d 647, 655 (8th Cir. 1982), for the proposition that "[a]n indictment must reveal on its face a proper basis for joinder." Ante at 27-28. Notwithstanding the court's unfettered confidence in Bledsoe, this issue equally divided the court in United States v. Grey Bear, 863 F.2d 572 (8th Cir. 1988) (en banc) (5-5 decision) (stating that an indictment must reveal on its face a proper basis for joinder) (Lay, C.J., Heaney, McMillian, Richard S. Arnold, and Wollman, JJ., joining) (stating that propriety of joinder is not limited to the face of the indictment) (John R. Gibson, Fagg, Bowman, Magill, and Beam, JJ., joining). I agree with the court's conclusion here that any joinder error was harmless, but I do not agree with the unnecessary citation to Bledsoe, particularly when unaccompanied by an explanation.

corruption in their own elections and their own government. Until Congress specifically provides for jurisdiction over this type of internal tribal matter, we must avoid the paternalistic temptation to assert jurisdiction based on the subjective belief that federal intervention is the only way to protect the civil rights of tribal members.

Jurisdiction over a dispute arising on an Indian reservation "is governed by a complex patchwork of federal, state, and tribal law." Duro v. Reina, 495 U.S. 676, 680 n.1 (1990). Because Indian tribes pre-existed the Constitution, they "still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United States v. Wheeler, 435 U.S. 313, 323 (1978). One aspect of this retained sovereignty includes the power to "control their own internal relations," Duro, 495 U.S. at 685, which necessarily includes criminal "jurisdiction of all controversies between" tribal members, e.g., In re Mayfield, 141 U.S. 107, 115-16 (1891). Congress has broad powers to modify this retained sovereignty by conferring federal jurisdiction over crimes committed on Indian reservations. See, e.g., Talton v. Mayes, 163 U.S. 376, 384 (1896). Thus, the question is whether Congress has provided jurisdiction for this federal prosecution.

The court correctly finds no basis for jurisdiction in the Indian Country Crimes Act and the Indian Major Crimes Act. See 18 U.S.C. §§ 1152 and 1153. Faced with congressional silence, however, the court turns to a general federal law, which by its terms applies to all persons. See 18 U.S.C. § 241. Section 241 provides that it is unlawful for two or more persons to "conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Id.

Assuming that Congress intended to include American Indians within the scope of laws which, by their terms, are applicable to all persons, we have applied general federal laws to tribal crimes. See, e.g., Stone v. United States, 506 F.2d 561, 563 (8th Cir. 1974). However, we have refused to extend this source of jurisdiction to purely

internal tribal matters because that would intrude upon tribal sovereignty.  See, e.g., United States v. White, 508 F.2d 453, 455 (8th Cir. 1974) (stating that "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests"); see also Felix S. Cohen, Felix S. Cohen's Handbook of Federal Indian Law, 286 (1982 ed.) (stating that "the Supreme Court has consistently recognized the unique status of tribes, Indians, and their lands, and has required that the congressional purpose of a conflicting law clearly require that it apply to Indians before Indian rights are held implicitly infringed").  Thus, the question is whether prosecution under section 241 for tribal election fraud intrudes upon tribal self-government.

The court mischaracterizes this inquiry by looking to whether there is a tribal right to use the election system fraudulently in order to maintain a position of power.  Ante at 24.  Obviously, no such right exists.  What the court fails to appreciate, however, is that the tribal right at issue is the exclusive right to prosecute tribal election offenses, which is necessary to maintain political integrity.  See Montana v. United States, 450 U.S. 544, 566 (1981) (discussing the inherent tribal power to regulate activities that "threatens or has some direct effect on the political integrity . . . of the tribe").  Intently focused on abating the corrupt actions of a few individuals, the court overlooks the important interest of the tribe in abating corruption within its own government.  Monitoring tribal elections is an area traditionally left to tribal government and any contrary holding would violate the federal policy of respecting tribal sovereignty in the absence of express congressional authority.

Of course, Congress could remove this aspect of sovereignty and interject federal election policies and remedies into tribal elections.  The wisdom of such a decision is best left to Congress, which is obviously better positioned to determine its potential impact.  Rather than deferring to Congress, the court recklessly adopts a newly minted balancing test, not fairly supported as near as I can find anywhere within the recorded

-51-

annals of American Indian litigation, weighing federal interests against tribal interests. See ante at 16. The result is a vague and incoherent test for jurisdiction. We should simply limit our inquiry to whether, on a case-by-case basis, the application of a general criminal law would infringe on tribal sovereignty. See Blue, 722 F.2d at 385.

I recognize that the oppression of tribal voting rights constitutes a fundamental assault on a democratic society and a serious violation of the civil rights of tribal members. Nonetheless, only Congress can remove this aspect of sovereignty. Because Congress has not so acted, I would decline to assert jurisdiction over the election conspiracy offenses.

Even if we did have jurisdiction, I would disagree with the court's unprecedented extension of a federal election statute (18 U.S.C. § 241) to a tribal election. Although the Supreme Court has applied section 241 to a hybrid local and federal election, it did so because the conspirators used a voting machine to cast votes for both federal and local candidates. See Anderson v. United States, 417 U.S. 211, 225 (1974). The Court expressly declined to address whether section 241 would apply to a conspiracy to cast false votes in a local election that did not include any federal candidates. Id. at 228.

Similarly, we have applied section 241 to a local election, but only where the conspirators destroyed absentee ballots that also included votes that had been cast for federal candidates. See United States v. Townsley, 843 F.2d 1070, 1080 (8th Cir. 1988). Contrary to the court's reading of Townsley, see ante at 19-20, we have never endorsed the application of section 241 to purely local, much less tribal, elections. We cautioned that "we do not reach the question left undecided by the Supreme Court—whether 18 U.S.C. § 241 extends to conspiracies to cast votes in purely local elections in which no federal candidate is on the ballot." Townsley, 843 F.2d at 1080 n.10. If we were required to reach this issue, which I submit we are not, due to our lack of jurisdiction in the first instance, I would not extend section 241 to a tribal

election.  <u>See</u> <u>Bathgate v. United States</u>, 246 U.S. 220, 226 (1918) (discussing the congressional policy "not to interfere with elections within a State except by clear and specific provisions").

Accordingly, I respectfully dissent from Part III of the court's decision.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.